Ralph Henry **COOPER**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 77–2288.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 15, 1978.
Decided March 5, 1979.

Alan G. Horwitz, Baltimore, Md., for appellant.

Michael J. Travieso, Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty. and Neal M. Janey, Asst. U. S. Atty., Baltimore, Md., on brief), for appellee.

Before WINTER, BUTZNER and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge:

Cooper appeals his jury trial conviction on two counts of bribery of a witness, 18 U.S.C. § 201(e), and two counts of obstruction of justice, 18 U.S.C. § 1503. He assigns errors in the conduct of the trial, and in the refusal of the district court to compel enforcement of a proposal made to him by the government in plea discussions. We find no prejudicial error in the trial, but find constitutional error in the district court's refusal to enforce the government's plea proposal. For this error we vacate the judgment and remand with instructions.

## I. FACTUAL BACKGROUND

The witness bribery and obstruction of justice charges against Cooper grew out of a series of telephone conversations he had with one Simpson at a time when Simpson was under indictment on federal narcotics charges, and Cooper was acting as a Drug Enforcement Administration (DEA) informer under the federal government's Witness Protection Program. Cooper had become an informer after his own arrest on narcotics charges in Maryland in November 1976. After making several valuable contacts for DEA agents that resulted in the indictment of several persons on narcotics charges, Cooper was moved under the Witness Protection Program to Little Rock, Arkansas. From there he was expected in due course to return to Maryland to testify as a government witness in the anticipated trials of several persons whose indictments he had helped secure, including Simpson.

**14**

From Little Rock on May 5, 1977, Cooper called Simpson in Maryland and offered for $10,000 to remove himself as a witness against Simpson by fleeing to Mexico. After asking Cooper to call back later, Simpson informed his attorney, a member of the Baltimore bar, of the call and sought his counsel. The attorney listened in on the telephone conversation between Cooper and Simpson when Cooper called back later on May 5. In this conversation it was arranged that Cooper would again call on the next day, May 6, 1977. Simpson then went with his attorney to the United States Attorney in Maryland and divulged to him and DEA agents these contacts with Cooper. Based upon the United States Attorney's promise that nothing said by Simpson would be used against him in his pending trial, an arrangement was made for government agents to monitor and record the anticipated call from Cooper. To safeguard Simpson's promised immunity against use of his expected statements, a summary of the case against him was prepared and put under seal. With these arrangements made, the telephone call that did then come from Cooper to Simpson was monitored by Simpson's attorney and two DEA agents, and was recorded by the latter, all with Simpson's consent. Cooper's statements in this and the earlier conversations as recorded, and as testified to by both Simpson and his attorney on Cooper's ensuing trial, were instrumental in securing his conviction from which this appeal is taken.

## II. ASSIGNED TRIAL ERRORS

Cooper assigns two errors in the conduct of his trial. We find no merit in either.[1]

■ He first contends that the recording of the telephone conversation he had with Simpson on May 6 was inadmissible. 18 U.S.C. § 2511(2)(c) provides that it is not unlawful to intercept a wire communication if one of the parties to the communication consents to the interception. Cooper does not suggest that Simpson failed to consent;

but contends that the consent was not voluntary because it was coerced by the grant of immunity and by his attorney's advice, and that it was not intelligently given. We have previously rejected the contention that a grant of immunity coerces consent to the interception of a wire communication, *United States v. Dowdy*, 479 F.2d 213, 229 (4th Cir. 1973), and find it no more persuasive in this case. The suggestion that Simpson's will was effectively overborne by his attorney's advice is patently without support in the record, as is the contention that the consent was not intelligently given.

■ Cooper also contends that the trial court abused its discretion in failing to sequester Simpson's attorney while Simpson was testifying about the telephone conversations of May 5 and before the attorney's testimony about that of May 6. Cooper's position is that the character of the May 6 conversation is ambiguous and that the testimony about the May 5 conversations was critical to the proof of the government's contention that Cooper had solicited a bribe from Simpson. Fed.R.Evid. 615 provides:

"At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses . . . . This rule does not authorize exclusion of . . . (3) a person whose presence is shown by a party to be essential to the presentation of his cause."

While Rule 615 does make exclusion ordinarily a matter of right, *L. S. Ayres & Co. v. NLRB*, 551 F.2d 586, 588 (4th Cir. 1977) (per curiam), the trial judge still retains a measure of discretion in the application of the exceptions to the rule, 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 615[01], at 615–8 (1977). In light of the pending charges against Simpson, we cannot say that the trial court abused that discretion in allowing his attorney to remain in the courtroom during his testimony. The grant of use immunity did not remove all the

1. Although we remand on the plea bargain issue alone, it was necessary to address these assignments of error as well. Finding prejudi-

cial error in either would significantly expand the options for defendant upon remand.

possible need that Simpson might have for the protection of counsel during his testimony.

## III. THE WITHDRAWN PLEA PROPOSAL

About two months before Cooper's trial, at around 11:00 a. m. on May 11, 1977, an Assistant United States Attorney and Cooper's then defense counsel met to discuss a possible plea bargain. After some initial negotiations, the government attorney proposed a plea agreement under which defendant would (a) be removed from the Witness Protection Program, (b) remain incarcerated, (c) continue to cooperate with the federal authorities, (d) plead guilty to one count of obstruction of justice, and (e) testify on three occasions in the on-going narcotics trials, while the government would (a) bring defendant's cooperation to the sentencing judge's attention, and (b) dismiss all other counts of the indictment. Defense counsel agreed to communicate the proposal to defendant, who was then incarcerated, and to get back to the government promptly.[2]

Defense counsel immediately visited Cooper and obtained his agreement to the proposal. Beginning at approximately noon on May 11, defense counsel attempted to call the Assistant United States Attorney and notify him of Cooper's acceptance but could not reach him. At 1:30 p. m. on May 11, the Assistant United States Attorney met with his superior, the United States Attorney for the District of Maryland, and was instructed by the latter to withdraw the proposal. When the Assistant United States Attorney and defense counsel finally made telephone contact later that afternoon between 2:30 and 3:30 p. m., Cooper's counsel was notified at the outset that the offer had been withdrawn. Defense counsel pro-

tested that this was not acceptable practice, and that Cooper had agreed to accept the proposal. When his protests were unavailing, he requested and received permission to carry his objection to the United States Attorney. This was done, but again to no avail. Defendant then moved to compel enforcement of the proposal, and at a pretrial hearing this motion was denied by the district court. Cooper's conviction on four counts, sentencing to a total of fifteen years imprisonment, and appeal followed.

In giving formal approval to plea bargaining as an essential and desirable practice in the administration of criminal justice, the Supreme Court in *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), made only brief allusion to the substantive principles that should control the practice. The considerations justifying it were said to "presuppose fairness in securing agreement between an accused and a prosecutor," *id.* at 261, 92 S.Ct. at 498, and an admonition was given that its use "must be attended by safeguards to insure the defendant what is reasonably due [in] the circumstances," *id.* at 262, 92 S.Ct. at 499. Beyond these general allusions, and except as substantive principles were necessarily implied in the very finding of right and violation on the specific facts of *Santobello*, the precise source and specific content of the right recognized and given protection in that case were not developed, but it was plain in context that the source was constitutional.[3]

■ Both before and since *Santobello*, the courts have understandably drawn heavily on the ready analogies of substantive and remedial contract law to supply the body of doctrine necessary to order plea bargaining practices and to afford relief to defendants aggrieved in the negotiating

2. On oral argument we were advised by defendant's counsel that the Assistant United States Attorney had represented in making the plea proposal that it would be held open for acceptance for a week. The record indicates a substantial concession of the point by the government attorney who made the proposal as he testified on cross-examination at the pre-trial

hearing of the motion to compel enforcement. Tr. 76, 77.

3. *Santobello* involved state prosecutorial action lying beyond the reach of the Supreme Court's supervisory judicial powers. Justice Douglas, concurring, specifically identified the right as constitutional. *Id.* at 266–67, 92 S.Ct. 495.

process. To the extent therefore that there has evolved any general body of "plea bargain law," it is heavily freighted with these contract law analogies.[4] When *Santobello* made it plain, however, that the core concept here is the existence of a constitutional right in the defendant to be treated with "fairness" throughout the process, this presaged inevitably the question of the extent to which contract law may be drawn upon to define the limits of this constitutional right. That is the precise issue presented in this case, where we are asked to find and enforce a right probably lying beyond any provided by contract law analogy.

In each of the earlier cases in which this court has found violations of defendants' plea negotiation rights, the defendant had entered a guilty plea and in some instances performed other obligations of a struck plea agreement before the government reneged on some element of its undertaking. *See United States v. Hammerman*, 528 F.2d 326 (4th Cir. 1975); *Harris v. Superintendent*, 518 F.2d 1173 (4th Cir. 1975) (per curiam); *United States v. Brown*, 500 F.2d 375 (4th Cir. 1974); *United States v. Carter*, 454 F.2d 426 (4th Cir. 1972). Therefore, in each of these cases a specific agreement had clearly been reached and the defendant had fully or substantially performed his side of the bargain before asserting any denial of right by the government's failure fully to perform its side. Accordingly, it was possible in each to view the defendant's situation as one perfectly analogous to that of any party aggrieved by the breach of an express commercial contract or by the failure of another to perform a promise upon which the party had relied to his tangible detriment, and to give an appropriate remedy— specific performance or rescission—again drawn from remedial contract law.

This is not the situation here. In this case we are asked to find a right and provide a remedy for a defendant whose attempted acceptance of a plea proposal was preceded by an asserted withdrawal of the proposal, so that in classic contract law there had arisen no right to be violated by the government and enforced by the courts. The alternative of "promissory estoppel" would seem no more available because of the lack of any tangible "detrimental reliance" by the defendant, who at this point had been able to do no more than form the subjective intent to accept the offer and experience whatever expectations of benefit had been created by anticipation of its fulfillment. Obviously analyzing the claim of right and violation essentially in these terms,[5] the district court found no merit in it and accordingly denied the relief sought.

■ While we agree that within classic contract doctrine the defendant here could probably claim no right and hence show no violation, we nonetheless conclude that right and violation of right was shown, and that relief must be given. This, of course, means that we find the constitutional right to "fairness" to be wider in scope than that

---

4. The cases are exhaustively collected and analyzed in these terms in P. Westen & D. Westin, *A Constitutional Law of Remedies for Broken Plea Bargains*, 66 Calif.L.Rev. 471 (1978).

5. This appears from the court's oral opinion given as it denied the motion to compel enforcement of the proposal. Although the court expressly conceded that contract and promissory estoppel analogies are not totally dispositive in this context ("some, but not all, contract criteria have been superimposed," Tr. 97; "plea bargaining possibly is something a little more than a contract, . . . [not] a mirror image of a contract," Tr. 99), the court's ultimate and decisive reliance upon these criteria seems clear, as the following extracts illustrate. *As contract*: "If you take it just as a plain contractual relationship and an offer and accept-ance, . . . an offer can be withdrawn prior to actual acceptance by the opposite party, and certainly here that's what took place. Before [defense counsel] could say 'accepted,' [the prosecutor] said 'withdrawn,' and . . . under any hornbook law that . . . would, of necessity, dispose of this matter." Tr. 96, 97. *As promissory estoppel*: "Analogous to promissory estoppel, plea bargaining must have more substantiality than mere expectation and hope. It must have explicit expressions and reliance and is measured by objective, not subjective standards. Now here I don't believe that under the circumstances . . . there is a reliance which would create a promissory estoppel or put the government in a position where they must comply." Tr. 97.

defined by the law of contract.[6] It does not mean that we deny the utility of contract analogies for plea bargain disputes under all circumstances, nor that we repudiate any earlier express or implicit reliance upon them in our own decisions; but simply that we must here note the limits of their utility. In doing so, we observe in the plea bargaining context what the Supreme Court has several times felt obliged to observe in others: that the temptation to take the relative certainties of established common law analogies too far in developing difficult constitutional doctrine is ever present and ever to be resisted.[7]

Having asserted the continued utility within limits of this analogizing process, but found the limits crucially exceeded in this case, we attempt now briefly to suggest the general limits before pursuing our analysis of right beyond contract law. In quite general terms, analogies from contract law will usually provide a reliable inclusive test for the existence of constitutional right and violation, but not an equally reliable exclusive test. Conduct by government prosecutors that in the market place would constitute breach of contract or give rise to promissory estoppel will practically always reflect constitutionally unfair conduct in transactions between sovereign and citizen in matters of liberty and punishment. But the obverse of this does not follow. Just because the elements of express contract or promissory estoppel have not been realized in particular plea negotiations cannot mean conclusively that there has been no unfairness in the constitutional sense. This is primarily because contract law is not concerned solely with fairness. True, it contains many elements having a moral or ethical cast designed to ensure minimally fair dealing in the market place, and these elements are readily transposed to the plea bargain context to provide the basis for holding government to its undertakings. But contract law also contains many elements of an essentially neutral moral and ethical cast. Some of these reflect merely a pragmatic necessity to force certainty of consequences in complicated negotiation exchanges. Others reflect an ultimately economic and utilitarian conception of bargaining objects. Among the former are such mechanical rules as those dictating the consequences of particular sequences in the transmission and receipt of contract offers, acceptances, withdrawals, etc. Among the latter is the demand of promissory estoppel for tangible as opposed to merely subjectively felt detriment as the reliance factor. These are all well and good for contract law, but constitutional decisions cannot be made to turn in favor of the government on the fortuities of communications or on a refusal to accord any substantive value to reasonably induced expectations that government will honor its firmly advanced proposals.

---

**6.** We frankly recognize that in finding the right to arise even before the formation by analogy of a fully executory "bilateral contract," we necessarily imply the enforceability by a defendant of such a "contract" before any performance on his part were the government to attempt "anticipatory repudiation." Because our earlier cases cited in text all involved enforcement following substantial performance by defendants of struck plea bargains, we must also recognize that this takes us not one but two steps beyond those earlier cases. As our analysis in text makes plain, this exactly reflects our view that the constitutional right involved here is not dependent upon the fortuitous timing of acceptances and withdrawals, nor upon antecedent performance by a defendant.

**7.** *See Brewer v. Williams*, 430 U.S. 387, 401 n. 8, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 423 (1977) ("we deal here not with notions of offer, acceptance, consideration, or other concepts of the law of contracts . . . [but] with constitutional law [in deciding whether a prosecutorial promise not to interrogate was enforceable]); *Stoner v. California*, 376 U.S. 483, 488, 84 S.Ct. 889, 892, 11 L.Ed.2d 856 (1964) ("rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority'"); *Silverman v. United States*, 365 U.S. 505, 513, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961) (Douglas, J., concurring) ("[o]ur concern [in determining the reach of the Fourth Amendment] should not be with the trivialities of the local law of trespass . . . ."); *Jones v. United States*, 362 U.S. 257, 266, 80 S.Ct. 725, 733, 4 L.Ed.2d 697 (1960) ("unnecessary and ill-advised to import into [Fourth Amendment law] subtle distinctions . . . . of private property law").

**18**

■ We must therefore reject the beguiling precision that these analogies promise as exclusive tests of constitutional right. We hold instead that under appropriate circumstances—which we find here—a constitutional right to enforcement of plea proposals may arise before any technical "contract" has been formed, and on the basis alone of expectations reasonably formed in reliance upon the honor of the government in making and abiding by its proposals.[8] At what point this right arises short of the struck bargain or any tangible, objective acts of reliance we need not attempt to say here as a matter of general rule. As in other realms of developing constitutional law, that must be left, whatever the difficulties, to case by case evolution on the variety of circumstances inevitably to be presented. It is sufficient here to identify the general sources of this right beyond contract law; to relate these to the crucial circumstances of the particular plea negotiations in this case; and then to subject the specific right found to a test of constitutional reasonableness.

We begin by noting that two distinct sources of constitutional right are involved here: most obviously and directly, the right to fundamental fairness embraced within substantive due process guarantees; less directly perhaps, but nonetheless importantly, the Sixth Amendment right to effective assistance of counsel. The general relevance of the former is too plain to require discussion. That of the latter can be readily stated. Because prosecutors are required to conduct plea negotiations through defense counsel, the government's positions and communications in plea discussions are necessarily mediated to the defendant through his counsel. Fed.R.Crim.P. 11(e)(1). *See also Anderson v. North Carolina*, 221 F.Supp. 930 (W.D.N.C.1963) (Craven, J.). For this reason, not only the credit and integrity of the government but those of his counsel are involved in a defendant's perception of the process. As Mr. Justice Stevens recently remarked concerning defendant/defense counsel/government relations in a related context involving another non-contractual undertaking by prosecutors:

At this stage [custodial interrogation of a defendant]—as in countless others in which the law profoundly affects the life of an individual—the lawyer is the essential medium through which the demands and commitments of the sovereign are communicated to the citizen. If, in the long run, we are seriously concerned about the individual's effective representation by counsel, the State cannot be permitted to dishonor its promise [that interrogation would not take place in counsel's absence] to [defendant's] lawyer.

*Brewer v. Williams*, 430 U.S. 387, 415, 97 S.Ct. 1232, 1248, 51 L.Ed.2d 423 (1977) (concurring opinion). To the extent that the government attempts through defendant's counsel to change or retract positions earlier communicated, a defendant's confidence in his counsel's capability and professional responsibility, as well as in the government's reliability, are necessarily jeopardized and the effectiveness of counsel's as-

---

8. In cases where guilty pleas have already been entered before the government has reneged, many courts, including this one, have apparently considered that the constitutional rights most directly, and perhaps solely, involved are those that protect against involuntary or unintelligent guilty pleas. *See, e. g., Santobello v. New York,* 404 U.S. at 261–62, 92 S.Ct. 495; *Harris v. Superintendent,* 518 F.2d at 1174. In this case, those rights are obviously not implicated, there having been no guilty plea, and the right to have reasonably induced expectations honored must therefore be found in other constitutional sources. As indicated in text of this opinion, we find them in Fifth Amendment guarantees of substantive due process and

Sixth Amendment guarantees of effective assistance of counsel. The commentators cited in note 4 *supra* make a persuasive argument that the allowance of specific performance relief, as in *Santobello,* can only be explained if the constitutional right protected is, as they believe, one deriving simply from government-induced expectations of a proposal's fulfillment. They find parallels for recognizing such a constitutionally based expectation right in other contexts such as double jeopardy and contract impairment, P. Westen & D. Westin, *supra* note 4, at 526–27, and would apparently consider it protectible in this context at least as soon as a "bilateral contract" has been formed. *Id.* at 535.

sistance easily compromised.[9] At the very least, these Sixth Amendment considerations add a heightened degree of obligation to the government's fundamental duty to negotiate with scrupulous fairness in seeking guilty pleas.

Within this general constitutional framework of substantive due process, here given an added dimension by the necessary implication of the right to effective assistance of counsel, we conclude that the defendant's constitutional rights were here violated by the government's failure to honor its plea proposal. In so holding, we emphasize those factual elements most crucial to our finding of right and violation in order to confine our holding as narrowly as we may for decision. Here the proposal was specific and unambiguous in form, and was made without any reservation related to a superior's approval or otherwise; its content was reasonable in context; it was made by a prosecutor with apparent (and probably actual) authority at the time; it was communicated promptly to the defendant so that no question of staleness was involved; the defendant assented promptly and unequivocally to its terms, indicated his assent to his counsel, and was entitled so far as the record shows to assume that its communication to the government would consummate the plea agreement; defense counsel did in fact within a matter of a few hours communicate defendant's acceptance to the government, by sheer fortuity being told of the government's "withdrawal" before he could vocalize his client's "acceptance"; and finally, the reason for the attempted withdrawal had nothing to do with extenuating circumstances affecting the government's or any public interest that were unknown when the proposal was extended, but lay simply in a superior's second-guessing of a subordinate's judgment. When, as here, such a proposal—specific, unambiguous and not unreasonable on its face—is offered by the government to a defendant through his counsel, constitutional fairness requires that it be fulfilled if within a reasonable time the defendant unequivocally communicates his assent to it, and unless in the interval extenuating circumstances affecting the propriety of the proposal that were unknown to and not reasonably discoverable by the government when the proposal was made have supervened or become known. This necessarily means that once presented, such a proposal may not be withdrawn in the face of proffered acceptance for no other reason than that a superior disagrees with an apparently authorized subordinate's judgment in making it.[10]

We conclude this analysis of constitutional right and violation by looking at the practical consequences on the one hand of recognizing the right, and on the other, of failing to recognize it. We do so because in the final analysis defendant's constitutional entitlement here is only to that process "reasonably due" under the circumstances, *Santobello,* 404 U.S. at 262, 92 S.Ct. 495, and the limits of reasonableness are to be found precisely in a weighing of the practical burdens imposed on government by its recognition against the practical consequences for this defendant and others similarly situated resulting from its non-recognition. This final test of reasonableness is clearly met. Ready means of safeguarding the right here recognized while protecting every legitimate governmental and public interest involved in plea bargaining plainly lie with the Department of Justice and the several offices of the United States Attorneys. First off, no right can arise in a defendant until plea discussions are voluntarily entered into by authorized

9. A subtle point perhaps, but one certainly familiar to every lawyer who has had to take to his client bad news respecting his settlement negotiations with the other side, particularly when these involve unfavorable changes of earlier positions. In the instant case there is indeed a strong indication of just such a loss of confidence. Defense counsel who was involved in the plea negotiations was replaced before trial.

10. *But see Shields v. State,* 374 A.2d 816 (Del. Sup.Ct.1977); *People v. Heiler,* 79 Mich.App. 714, 262 N.W.2d 890 (1977).

government agents; there is no constitutional right in defendants to have the government "bargain" in the first instance. *Weatherford v. Bursey,* 429 U.S. 545, 561, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Once plea discussions are underway, it clearly lies with these agencies of government, among other things, to keep the left hand informed of the right's doing;[11] to withhold or limit the actual, and circumscribe the apparent, authority of subordinates if this be considered necessary; to incorporate reservations relating to higher level approval routinely in all proposals or specially in some; and, if thought necessary, to protect against perjured testimony of the making and acceptance of proposals by routine requirements of signed memoranda. We cannot believe such simple and obvious precautions unreasonable or even significantly burdensome from an administrative standpoint. Indeed, careful consideration of such procedures would seem now mandated by the deliberate subjection of plea bargaining practices to systematic judicial scrutiny under Fed.R.Crim.P. 11(e).

Reasonableness of the right's recognition is equally compelled by a consideration of the unreasonableness of permitting the indiscriminate withdrawal of plea proposals at the stage attempted in this case. There is no suggestion in this record of deliberate abuse of the assumed opportunity freely to make and withdraw plea proposals as a means of testing the wills and confidence of defendants and their counsel or of deliberate harassment. We must recognize, however, that our failure to find constitutional right and violation in this case would necessarily give judicial approval to a practice whose possibilities for easy abuse, or at least the appearance of abuse, are abundantly clear.

---

11. Episodic failures of communication and the lack of established procedures to ensure inter and intra-office consistency of plea bargain positions recur in the cases as causes of broken plea bargain promises. *See, e. g., Santobello v. New York,* 404 U.S. at 262, 92 S.Ct. 495 (different prosecutors from same office at bargain and plea times); *United States v. Brown,* 500

The special irony of enforcing a constitutional right to have government honor its commitments to a defendant proven to have dishonored his own commitments to that same government is not lost upon us. In its light, what we said in *United States v. Carter* gains added significance and bears repeating here:

> "There is more at stake than just the liberty of this defendant. At stake is the honor of the government[,] public confidence in the fair administration of justice, and the efficient administration of justice . . . ."

454 F.2d at 428. To which we would add that while the specific expectation interest that we vindicate here is that of this defendant, the vindication runs to a wider public interest in the matters at issue.

## IV. REMEDY UPON REMAND

There remains the question of the appropriate remedy for correcting on remand the constitutional error here found. Obviously the only remedy available is specific enforcement of the plea proposal, to the extent that is now possible. Events occurring both in and out of court since the district court declined to enforce the proposal as made have so far compromised the situation that full enforcement may only be approximated now. The *status quo ante* can obviously not now be reconstructed to permit the district court objectively to consider under Fed.R.Crim.P. 11(e) whether on the facts then subsisting the proposed plea agreement should be accepted. That it could have done so in the first instance and in the process rejected the proposal does not now inhibit us in directing enforcement on remand. *See Harris v. Superintendent,* 518 F.2d at 1174; *United States v. Carter,* 454 F.2d at 428. While it can be assumed that

---

F.2d at 378 (same); *United States v. Carter,* 454 F.2d at 428 (promise allegedly made by one United States Attorney's office breached by another). Just such a failure of communication or understanding underlay the difficulty here. Government can avoid these; defendants have no control over them.

defendant will elect to plead guilty as proposed upon remand, since his conviction must otherwise stand, we can of course only give that as an option; we cannot direct it. Though it is conceivable that defendant might still be held to some aspects of the other obligations of the proposal, we think the situation so far compromised now by the lapse of time and intervening circumstance that this must simply be disregarded on remand. By like token, the government should be now considered relieved of any reciprocal obligations respecting sentencing recommendations. This leaves the proposal to dismiss all other charges, which of course may now be enforced contingent upon the entering of the proposed guilty plea.

Accordingly, we vacate the judgment and remand with instructions that the defendant be now allowed to enter a plea of guilty to one of the counts of obstruction of justice upon which he was convicted.[12] If he does so, the indictment should be dismissed as to all remaining counts; otherwise the judgment may be reinstated. Further proceedings should be conducted by a district judge who has not participated in the prior proceedings, and in the course of any further proceedings the government is relieved of any obligations respecting sentencing recommendations that were included in the original plea proposal.

*VACATED AND REMANDED WITH INSTRUCTIONS.*

---

12. The indictment originally contained three counts of obstruction of justice. One was dismissed, along with a bribery count, before trial.