Curtis Dean PURSER, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–93–00194–CR.

Court of Appeals of Texas,
El Paso.

June 15, 1995.

Paul Williams, Midland, for appellant.

Al W. Schorre, Jr., Dist. Atty. of Midland County, Midland, for State.

Before LARSEN, McCLURE and CHEW, JJ.

## OPINION

LARSEN, Justice.

Curtis Dean Purser, appellant, appeals from a conviction for the offense of capital murder. The jury found appellant guilty as charged in the indictment, but it could not reach a unanimous verdict with regard to special issue number one. Accordingly, the court sentenced appellant to life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. TEX. CODE CRIM.PROC.ANN. art. 37.071, § 2(g) (Vernon Supp.1995). We affirm.

## FACTS

The victim, Brenda Branch, worked at the Living Way Foursquare Church in Midland, Texas, as the church secretary and bookkeeper. Branch and the pastor of the church, James Edward Whitaker, arrived at the church at 9 a.m. on the morning of November 13, 1991. Whitaker left at approximately 10:15 that morning to run some errands, and he returned shortly before 11:20 a.m. with a church member. Whitaker found Branch lying on her back in a large pool of blood in a storeroom adjacent to his office. Her pants had been unzipped and pulled down, along with her underwear, below her hips. The autopsy showed that Branch had been stabbed and cut approximately thirty-six times by a single-edged knife. She died as a result of multiple stab wounds and incised wounds of the head, neck, trunk, and extremities. The medical examiner also found a bite mark on the back of the right side of Branch's neck.

Detective B.G. Johnson of the Midland Police Department suspected that Gearld Benjamin Kelly had committed the offense because he previously had been convicted of a similar offense and had been observed "investigating" some churches just prior to the killing. Consequently, a few hours after the discovery of Branch's body, Johnson and Detective Alan Inman contacted Kelly at his residence located less than a mile from the church. During their visit, Inman noticed that Kelly had cuts on his right hand. Kelly would not give Johnson a detailed statement concerning what he had done that day. However, he voluntarily turned over some boots which appeared to have a large amount of blood on them. Subsequent examination of Kelly's boots showed that they matched a bloody shoeprint found by Whitaker's desk. On the day following the offense, a detective found a bloody coat with damp, bloody gloves in its pockets in the dumpster behind appellant's home. Subsequent testing of these items showed that bloodstains found on the right sleeve matched the victim's blood, while bloodstains found on the gloves matched Kelly's blood. Kelly was further connected to the offense by evidence showing that the bite mark found on the victim's neck matched

Kelly's teeth on the upper left side of his mouth.

Law enforcement authorities, including investigators in the district attorney's office, initially believed appellant to be nothing more than a witness in this case. After denying his involvement for several months and telling several different stories, appellant eventually admitted in an audiotaped statement that he and Kelly planned the robbery and participated together in the assault upon Branch. Specifically, he admitted that he stabbed the victim twice.

### VOLUNTARINESS OF CONFESSION

■ In Point of Error One, appellant contends that the trial court erred in failing to suppress his statements.[1] Appellant argues that his statements were impermissibly obtained as the result of a promise by J.D. Luckie, an investigator for the Midland County District Attorney's Office, that the state would not seek the death penalty if appellant confessed. The state denies making any promises to appellant.

■ In order for a confession to be rendered involuntary by the promise of a benefit, a four-part test must be met. The promise must be: (1) of some benefit to the defendant; (2) positive; (3) made or sanctioned by a person in authority; and (4) of such character as would be likely to influence the defendant to speak untruthfully. *Arnold v. State*, 873 S.W.2d 27, 33–34 (Tex.Crim.App.1993); *Sossamon v. State*, 816 S.W.2d 340, 345 (Tex. Crim.App.1991); *Fisher v. State*, 379 S.W.2d 900, 902 (Tex.Crim.App.1964). At a hearing to determine the voluntariness of a confession, the state need not rebut appellant's assertions, but only controvert them. *Muniz v. State*, 851 S.W.2d 238, 252 (Tex.Crim.App. 1993); *Dunn v. State*, 721 S.W.2d 325, 333 (Tex.Crim.App.1986). When the case presents a controverted issue, the trial court acts exclusively as the fact finder, assessing the credibility of the witnesses and the weight to be accorded their testimony. *Muniz*, 851 S.W.2d at 252; *Gentry v. State*, 770 S.W.2d 780, 790 (Tex.Crim.App.1988). If the trial

court's resolution of a controverted issue is supported by the record, a reviewing court should not disturb the trial court's decision. *Muniz*, 851 S.W.2d at 252; *Dunn*, 721 S.W.2d at 336.

The record supports a finding by the trial court that appellant failed to establish that a person in authority had promised him that the state would not seek the death penalty if he confessed. Luckie had numerous discussions with appellant over a several month period during the investigation. When appellant first came to the attention of the authorities, including Luckie, he appeared to be nothing more than a witness. As the case developed, however, appellant moved from the status of merely being a witness to having some involvement as a party to the offense, and finally, to being an actual participant in the stabbing of the victim.

In order to address appellant's contention, it is necessary to summarize the events leading to each of appellant's statements. Approximately one week after the offense, appellant appeared before the grand jury pursuant to a subpoena and testified against Kelly. Appellant told the grand jury that Kelly came by his residence on the morning of the offense and mentioned robbing a church. He said that Kelly returned later with blood on him and claimed that he had gotten into a fight and stabbed a black man. Several days after this testimony, appellant turned over to police a knife which he stated Kelly had used in the murder of Brenda Branch.

Appellant agreed to verify his story by means of a polygraph examination. After appellant failed two polygraph examinations in December of 1991, he gave a new statement to Luckie in which he admitted that he had been at the church with Kelly. He stated that he stayed outside the church and acted as a lookout, but he maintained that he did not participate in the murder.

On April 2, 1992, Luckie learned that a hair found on Branch's body matched appellant's hair. When Luckie confronted him

---

1. The state offered only one of appellant's statements into evidence at trial, namely, the April 15, 1992 statement in which he admitted that he

stabbed the victim twice. Appellant offered into evidence appellant's prior statements.

with this evidence, appellant admitted that he had gone inside the church with Kelly and watched him stab Branch, but he said that he did not participate in the killing. Appellant offered to take another polygraph to verify this story. An examiner administered that test less than two weeks later. He determined that appellant showed deception when he denied participating in the stabbing of the victim. When told of his failure, appellant admitted to Luckie that he had stabbed Branch twice, once in the throat and once in the chest. Appellant then gave the taped confession that is the subject of this point of error. In that confession, appellant discussed in detail how he and Kelly planned the robbery and carried it out. Appellant admitted stabbing the victim once in the throat and once in the chest.

Luckie denied threatening appellant or making any kind of agreement in order to obtain any of the statements. He specifically stated that he did not promise appellant that he would not get the death penalty if he cooperated. The taped statement reflects that appellant was advised of his *Miranda* rights and voluntarily waived them. After appellant admitted his involvement in the killing, he told Luckie that what he did was wrong and he thought he should die for it. Luckie told appellant twice that he could get the death penalty, and he asked him if he wanted to retract anything in his statement. Appellant stated that he had told the truth and he did not want to take back anything he had said. At the conclusion of the tape, appellant apologized to the investigators and said that he "appreciated them." In response, Luckie reminded appellant that, at the very least, he was going to go to prison. Luckie then asked appellant whether they had promised him anything in exchange for his statement. Appellant said that nothing had been promised him, that he had given his statement of his own free will, and that he was glad he had given it.

At the pretrial suppression hearing, appellant testified that Luckie promised him that he would only have to serve a couple of years

in prison if he would help Luckie "get Kelly." By his own words, he understood this "deal" as requiring him to testify against Kelly. Appellant never testified that he understood that he was required to confess in order to be eligible for the sentence.

In support of his contention that a promise was made, appellant directs our attention to two questions asked of appellant's mother, Carol Purser, by the district attorney, Al Schorre, during the meeting of the grand jury which indicted Appellant.[2] According to the transcription of Mrs. Purser's grand jury testimony, she told the grand jury that appellant had privately recanted each of his statements after he made them to investigators, but she did not tell anyone because of her fear that the state would seek the death penalty against appellant. Schorre then asked her:

> Weren't you aware that—as they had told Curtis, that if, in fact, he was involved, if he testified against Benjamin Kelly, that they would not seek the death penalty, that they would let him plead to a term of imprisonment?

Later, Purser testified that the investigators had coerced appellant into telling so many different stories. When asked to explain what she meant by coerced, Purser stated:

> I mean they said, 'You can't lie to us. And if you don't confess, we are going to come against you with capital murder and the death penalty.' I heard them say that myself.

Schorre then asked Purser the following question:

> Well, in fact—I mean, as I have always heard it, what they were telling him, if you will cooperate in the investigation, if you participate in it and you testify against Kelly, then they wouldn't seek the death penalty.

At trial, Schorre testified in rebuttal that both of his questions referred to a plea bargain offer which his office had conveyed to appellant through counsel after the April 15

2. Appellant did not offer this evidence until the guilt-innocence phase of trial. At the conclusion of this phase of the trial, appellant renewed his motion to suppress based upon this evidence.

The trial court considered this evidence but denied the motion to suppress. The court submitted an instruction to the jury on the voluntariness of appellant's statements.

confession, but which had been rejected by appellant.[3] Schorre explained that he made reference to the plea bargain because both appellant and Mrs. Purser had told the grand jury that appellant had given the confession only because the state had made a deal with him, but that the state had reneged on its promise. Schorre said that he had never authorized Luckie to make a deal of any kind with appellant and that to his knowledge, Luckie had not made a deal with him.

Seemingly conceding that there is no evidence of an express promise or agreement not to seek the death penalty if appellant confessed, appellant argues that the inducement to confess is contained in the requirement that appellant "cooperate" in order to avoid the death penalty. Even if we were to assume that the word "cooperate" encompasses a requirement that appellant confess, the evidence with regard to whether Luckie or anyone else made this representation to appellant is controverted.

Luckie and the other investigators involved in the case repeatedly denied promising appellant that he could avoid the death penalty if he cooperated or confessed. Appellant stated in the taped confession that he had not been promised anything in exchange for his confession, he had given the statement of his own free will, and he understood that his statement subjected him to the death penalty. Appellant never testified that anyone told him that "cooperate" meant he must confess, nor did he say that he had been led to believe that he must do so in order to comply with the alleged agreement that he "cooperate." The trial court could have believed the evidence showing that no promise had been made and disbelieved the evidence to the contrary. Because there is evidence supporting a determination that a party in authority did not make a positive and unequivocal promise not to seek the death penalty if appellant confessed, the trial court did not abuse its discretion in denying the motion to suppress. See Jacobs v. State, 787 S.W.2d 397, 400 (Tex.Crim.App.1990). Point of Error One is overruled.

3. Shortly after appellant confessed, the state offered to allow appellant to plead guilty to capital murder for a life sentence if he would testify against Kelly at his trial. Appellant, through his attorney, rejected this plea offer prior to the meeting of the grand jury in August of 1992.

## CORROBORATING EVIDENCE OF ROBBERY

In his second point of error, appellant asserts that the trial court erred in denying his motion for instructed verdict on the ground that the state failed to produce independent evidence to corroborate appellant's extrajudicial statement that the murder occurred during the course of committing robbery. Pointing to a lack of evidence showing that anything had been taken from the church or the victim, appellant asserts that the state failed to establish the theft element of robbery by independent evidence.

The common law corpus delicti rule is that no criminal conviction can be based on a defendant's extrajudicial confession unless the confession is corroborated by independent evidence tending to establish the corpus delicti. *Fisher v. State*, 851 S.W.2d 298, 302 (Tex.Crim.App.1993). The corpus delicti of any crime simply consists of the fact that the crime in question has been committed by someone. *Id.* at 303. In the context of capital murder, the extrajudicial statement must be corroborated by independent evidence tending to establish the corpus delicti of murder *and* the underlying felony. *Gribble v. State*, 808 S.W.2d 65, 70 (Tex.Crim. App.1990), *cert. denied*, 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991). The evidence, however, does not have to be sufficient by itself to prove the commission of the underlying felony. *See id.* at 71. The rule does not require that the independent evidence fully prove the corpus delicti, only that it tend to prove the corpus delicti or render the corpus delicti more probable than it would be without the evidence. *Fisher*, 851 S.W.2d at 302–03; *Gribble*, 808 S.W.2d at 72.

A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of property, he intentionally, knowingly, or recklessly causes bodily injury to another or he intentionally or knowingly threatens or places another in fear of bodily injury or death.

TEX.PENAL CODE ANN. § 29.02(a) (Vernon 1994). Citing *Thomas v. State*, 807 S.W.2d 803 (Tex.App.—Houston [1st Dist.] 1991, pet. ref'd), appellant makes much of the fact that Pastor Whitaker could not definitely say that anything had been taken from his desk or office. This contention misses the point because the actual commission of the offense of theft is not a prerequisite to the commission of the offense of robbery; the gravamen of robbery is the assaultive conduct and not the theft. *Crank v. State*, 761 S.W.2d 328, 350 (Tex.Crim.App.1988), overruled on other grounds, *Alford v. State*, 866 S.W.2d 619, 624 n. 8 (Tex.Crim.App.1993); *Autry v. State*, 626 S.W.2d 758, 762 (Tex.Crim.App.1982); *Lookingbill v. State*, 855 S.W.2d 66, 74 (Tex. App.—Corpus Christi 1993, pet. ref'd). The phrase "in the course of committing theft" within the robbery statute, means conduct which occurs in an attempt to commit, during commission, or in immediate flight after the attempt or commission of theft. *Autry*, 626 S.W.2d at 762. Thus, the state was not required to conclusively show by independent evidence that a completed theft actually occurred in order to establish the corpus delicti of robbery. It was required only to adduce evidence, other than appellant's confession, which tended to show that Branch was assaulted while the perpetrators were in the course of committing or attempting to commit theft.

We find *Thomas v. State* distinguishable from the instant case. In *Thomas*, which is an aggravated robbery case, the appellant allegedly stated to two of his relatives that he had gone to the victim's residence to obtain cocaine. He told these witnesses that he shot the victim in the head with her pistol and then took her jewelry, drugs, pistol, and money. During trial, one of the two witnesses recanted his story during cross-examination, and stated that he had given a written statement implicating the appellant only because police had threatened to charge him with the offense. Police found the victim, who had been shot in the head, on her kitchen floor. They determined that she had been shot after a brief struggle. None of the victim's jewelry had been removed from her body. Her purse was found lying open on the kitchen floor nearby with its contents intact and undisturbed. In the purse, police found 75 cents and a matchbox containing eight rocks of cocaine. Other cocaine was found in plain view in the apartment. The Court of Appeals concluded that the evidence was just as consistent with a struggle as with the commission of theft or attempted theft. Consequently, it held that the state had failed to establish the theft element of aggravated robbery by independent evidence.

■ In the instant case, Whitaker discovered Branch's body in the doorway of a storage closet adjacent to his office. After calling for help, Whitaker returned to his office and observed that someone had kicked over a basket and had pushed his chair away from the center of the desk towards one end of the credenza. He saw that his desk drawers and two file drawers had been opened, and he also found one of his desk drawers on the floor. His office had not been in this condition when he had left it approximately one hour earlier. It appeared to Whitaker that someone had rummaged through the contents of his desk, including the drawer on the floor. Whitaker said that he kept loose coins in the drawer on the floor, but he could not tell whether any money was missing since he had not counted the change. Thus, he could not say with certainty whether anything had been taken from the office or his desk. The investigators also found a bloody footprint on the plastic chair pad behind the pastor's desk.

Similar to the situation in *Thomas*, the assault on Branch occurred in an area adjacent to the pastor's desk. Thus, it could be inferred that the desk drawers were opened during Branch's struggle with her assailants. Unlike *Thomas*, however, there is further evidence of theft or attempted theft in that Whitaker testified that someone had rummaged through the contents of his desk. Furthermore, the bloody footprint is found directly behind the desk where the drawers were found opened. No other blood is found around the desk. This leads to an inference that after the assault had been committed, the perpetrator stepped in blood near the victim's body and then stepped behind the desk and looked through the desk drawers. Even though the evidence does not conclu-

sively show that the actor successfully located and took property from the pastor's desk, the evidence tends to show, or at the very least, makes it more probable than it would be without the evidence, that the assault upon Branch occurred in the course of the commission of theft or attempted theft. Consequently, the evidence adequately corroborates appellant's extrajudicial statement. Point of Error Two is overruled.

### WITHDRAWAL OF PLEA AGREEMENT

In Point of Error Three, appellant contends that the district attorney violated his right to due course of law guaranteed by Article I, § 19 of the Texas Constitution by withdrawing the plea offer prior to the agreed time and date for termination of the offer. Appellant also asserts that the trial court erred in denying appellant's motion to compel performance of the plea bargain agreement by the prosecution.

Shortly after appellant confessed, the state offered to allow appellant to plead guilty to capital murder for a life sentence if he would testify against Kelly at his trial. Appellant, through his attorney, rejected this plea offer prior to the meeting of the grand jury in August of 1992, but the state allowed the offer to remain on the table until January of 1993. Sometime in early January of 1993, the state modified the plea bargain agreement to allow appellant to plead guilty to the lesser-included offense of murder for a life sentence with a deadly weapon finding. After initially rejecting this offer, appellant attempted to accept it; however, the state withdrew the offer before appellant accepted it.

It is axiomatic that when a defendant enters a plea of guilty or nolo contendere pursuant to a plea bargain agreement, and the plea is accepted and the agreement is approved by the trial judge, the state is bound to carry out its side of the plea bargain or the plea itself is involuntary. *Ex*

*parte Austin,* 746 S.W.2d 226, 227 (Tex.Crim. App.1988). The appropriate relief for failure to keep a plea bargain is either specific enforcement of the agreement or withdrawal of the plea, depending upon the circumstances of each case. *Ex parte Austin,* 746 S.W.2d at 227; *Joiner v. State,* 578 S.W.2d 739 (Tex. Crim.App.1979). However, a defendant who has agreed to the terms of a plea bargain does not have a constitutionally protected right to enforce performance of that plea bargain if it is subsequently withdrawn by the prosecution. *Mabry v. Johnson,* 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984) [4]; see *Ex parte Williams,* 637 S.W.2d 943, 947 (Tex.Crim.App.1982) (a plea bargain is an executory contract and does not become operative until the plea has been entered and the court has announced it will be bound by the plea agreement).

Appellant argues that the due course of law provision of the Texas Constitution provides him with a broader right to fundamental fairness than the due process clause of the Fourteenth Amendment. However, he does not cite any authority or provide any analysis supporting this assertion. Historically, the due course of law provision found in Article I, § 19 of the Texas Constitution has been equated and deemed synonymous with the guarantee of due process under the Fourteenth Amendment. *Long v. State,* 742 S.W.2d 302, 319 (Tex.Crim.App.1987), overruled on other grounds, *Briggs v. State,* 789 S.W.2d 918, 921–22 (Tex.Crim.App.1990). The Court of Criminal Appeals has declined to give the due course of law clause a broader or more expansive meaning than what is provided by the Fourteenth Amendment. See *Long,* 742 S.W.2d at 319–20; *McCambridge v. State,* 778 S.W.2d 70 (Tex.Crim. App.1989) (Court did not interpret due course of law provision more broadly than due process clause). Consequently, we decline appellant's invitation to interpret it more expansively than the federal constitu-

---

**4.** Appellant cites only a single case, *Cooper v. United States,* 594 F.2d 12 (4th Cir.1979), in support of his claim that he has a constitutional right to compel performance of a plea bargain offer which has been withdrawn by the state. In *Cooper,* the Fourth Circuit determined that the defendant had a right under the United States

Constitution to compel performance of a plea bargain which had been withdrawn by the government. However, *Mabry v. Johnson* overruled *Cooper.* See *United States v. Hernandez,* 948 F.2d 316 (7th Cir.1991) (recognizing overruling of *Cooper* by *Mabry v. Johnson* ); *Plaster v. United States,* 789 F.2d 289 (4th Cir.1986) (same).

tion. We hold that appellant does not have a right under Article I, § 19 to enforce the plea bargain which had been withdrawn prior to the set time for expiration of the offer. Accordingly, the trial court did not abuse its discretion by denying appellant's motion to compel performance of the plea bargain. Point of Error Three is overruled.

### TESTIMONY BY PROSECUTOR

In Point of Error Four,[5] appellant contends that the trial court erred in permitting the district attorney to continue prosecuting the case after he testified during rebuttal. In raising this contention, he relies solely upon Rule 3.08 of the State Bar Rules of Professional Conduct. The state contends that appellant failed to preserve error because he failed to obtain an adverse ruling. We agree.

In order to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling he desired the court to make if the specific grounds were not apparent from the context. TEX.R.APP.P. 52(a). After appellant raised his complaint, the trial court took appellant's request to direct the district attorney to withdraw under advisement. Appellant does not cite us to the portion of the record in which the trial court ruled on his request, nor have we found such a ruling. By failing to pursue his complaints to an adverse ruling, appellant's complaint is not preserved. TEX.R.APP.P. 52(a); *Ramirez v. State*, 815 S.W.2d 636, 643 (Tex.Crim.App. 1991); *Murillo v. State*, 839 S.W.2d 485, 493 (Tex.App.—El Paso 1992, no pet.).

Even if appellant had preserved error, this contention is without merit for two reasons. Appellant sought relief at trial, and now on appeal, solely on the basis of a violation of Rule 3.08 of the State Bar Rules. Appellant fails to recognize that the State Bar Rules do not provide a criminal defendant with affirmative rights. See *Wilson v. State*, 854 S.W.2d 270, 274–75 (Tex.App.—Amarillo 1993, pet. ref'd); *Youens v. State*,

742 S.W.2d 855 (Tex.App.—Beaumont 1987, pet. ref'd). Purported ethical violations by a prosecutor should be dealt with by the administrative procedures specifically established to deal with such conduct. *Randell v. State*, 770 S.W.2d 644, 647 (Tex.App.—Amarillo 1989, no pet.). It is only when an ethical breach on the part of a prosecutor rises to the level of a due process violation that a trial court is authorized to disqualify a district attorney or his staff. *State ex rel. Hill v. Pirtle*, 887 S.W.2d 921, 927 (Tex.Crim.App. 1994) (trial court may not disqualify a district attorney or his staff on the basis of a conflict of interest that does rise to the level of a due process violation); *State ex rel. Eidson v. Edwards*, 793 S.W.2d 1, 6 (Tex.Crim.App. 1990) (same). Appellant did not object at trial nor does he argue on appeal that the district attorney's continued participation in the trial, including final argument, constituted a violation of due process. Consequently, his contention that the district attorney violated Rule 3.08 does not entitle him to any affirmative relief. Point of Error Four is overruled.

### CONCLUSION

Having overruled Points of Error One through Four, the judgment of the trial court is affirmed.

---

5. Appellant raised this point of error in a supplemental brief, but did not designate it as his fourth point of error. For ease of reference, we will consider it his fourth point of error.