NO. 07-01-0093-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL C



NOVEMBER 20, 2001


______________________________



JOHN VINEYARD
,




 Appellant


v.



THE STATE OF TEXAS, 




 Appellee

_________________________________



FROM THE 140TH DISTRICT COURT OF LUBBOCK COUNTY;



NO. 2000-434,575; HON. MACKEY HANCOCK, PRESIDING


_______________________________



Before QUINN, REAVIS, AND JOHNSON, J.J.

 John Vineyard (appellant) appeals his conviction for driving while intoxicated
(DWI). His sole issue concerns the effectiveness of his trial counsel. The latter was
purportedly ineffective because of "counsel's failure to either present appellant's motion
for new trial to the trial court or request a hearing thereon." We overrule the issue and
affirm the judgment. 

Background


 Appellant was convicted by a jury for the felony offense of DWI. The punishment
range was enhanced to a second degree felony due to previous convictions, and the trial
court sentenced appellant to fifteen years in the Institutional Division of the Texas
Department of Criminal Justice on December 18, 2000. On January 17, 2001, appellant
filed a motion for new trial, which motion was overruled by operation of law on March 5,
2001. 

 Standard of Review


 The standard of review applicable to claims of ineffective assistance is well-known
and will not be repeated here. We find it sufficient to merely refer the litigants to
Thompson v. State, 9 S.W.3d 808 (Tex. Crim. App. 1999) and Beck v. State, 976 S.W.2d
265 (Tex. App.-Amarillo 1998, pet. ref'd) for an explanation of same. 

Application of Standard


 To adequately preserve an issue for appeal by way of motion for new trial, the
motion must be presented to the trial court. Tex. R. App. Proc. 21.6; Coronado v. State,
25. S.W.3d 806, 810 (Tex. App.-Waco 2000, pet. ref'd). And, while presentation denotes
the provision of actual notice to the trial court of the pending motion, there is no exclusive
way in which that notice must be afforded to the court. Carranza v. State, 960 S.W.2d 76,
79-80 (Tex. Crim. App. 1998) (stating that presentment requires the provision of actual
notice to the trial court but that the manner of presentment described in the opinion was
not exhaustive but merely suggestive as to how one may fulfill the requirement). 

 Here, appellant complains of counsel's failure to present his motion for new trial to
the trial court. Yet, he does not cite us to any evidence of record illustrating that such
presentment did not occur. He merely states in his brief that it did not. See Good v.
Shoufeh, 915 S.W.2d 666, 671 (Tex. App.-Amarillo 1996), aff'd, 943 S.W.2d 441 (Tex.
1997)(holding that unsworn statements of fact in an appellate brief are not evidence). Nor
may we assume that presentation did not occur simply because the motion for new trial
was overruled by operation of law. We know of nothing which prevents a trial court
wishing to deny a motion for new trial to affirmatively deny same through order once it is
presented. Indeed, the court may simply allow it to be denied by permitting 75 days to
lapse. Tex. R. App. Proc. 21.8(a) & (c). So, because the alleged instance of
ineffectiveness does not appear of record, see Jackson v. State, 877 S.W.2d 768, 771
(Tex. Crim. App. 1994)(holding that the supposed claim of ineffectiveness must be shown
in the record), appellant did not carry his burden of proof. 

 Next, to the extent that appellant also suggests that counsel was ineffective for
other reasons, we address them briefly. (1) The first pertains to the failure to secure medical
records which allegedly show that appellant may have suffered a stroke at one time or
another. In mentioning this as a possible ground of ineffectiveness, appellant does not
explain how the omission prejudiced him. Nor does he cite us to anything of record
illustrating that he had suffered a stroke at any time, that the characteristics of a stroke
resemble those of driving under the influence of intoxicants, or that he was actually
suffering from the effects of a stroke (or any other illness) rather than alcohol when
arrested for driving while intoxicated. So, that medical records could have been
discovered had trial counsel expended greater effort in obtaining same means nothing
without a showing that the records contained anything having a reasonable chance of
affecting the outcome of the trial. See Thompson v. State, 9 S.W.3d at 812 (requiring
appellant to show a reasonable probability that but for counsel's supposed error, the result
would have been different).

 As to the contention that counsel was ineffective because he did not move to
enforce the plea offer made by the State, the evidence indicates that the offer expired
before appellant accepted it. The offering having expired, there was nothing for counsel
to enforce. Purser v. State, 902 S.W.2d 641, 648 (Tex. App.-El Paso 1995, pet. ref'd),
cert. denied, 525 U.S. 838, 119 S. Ct. 98, 142 L. Ed. 2d 78 (1998) (stating that a defendant
does not have a protected right to enforce performance of an agreement that has been
withdrawn by the State). There being nothing to enforce, we cannot fault counsel for not
enforcing it. Moreover, we are cited to no evidence illustrating that 1) counsel withheld
from appellant timely notification of the offer, 2) counsel otherwise failed to timely and
reasonably advise his client about the merits of accepting or rejecting it, 3) appellant was
unaware of the deadline for accepting the bargain, or 4) appellant opted to accept the offer
while it was viable but counsel failed to timely relay the acceptance to others. 
Consequently, we cannot say that appellant proved that his attorney rendered assistance
which fell below an objective standard of reasonableness.

 Finally, appellant insinuated that his counsel was deficient because he neither
obtained the medical records or accepted the plea bargain. Yet, as discussed above,
there is no evidence before us illustrating that the medical records contained evidence
favorable to appellant. Nor is their evidence indicating that appellant wanted to accept the
plea before the offer expired. More importantly, counsel could not have accepted it on
behalf of his client without the consent of his client. Flores v. State, 784 S.W.2d 579, 581
(Tex. App.-Fort Worth 1990, pet. ref'd)(holding that the ultimate decision to accept the
plea is the defendant's). So, logic dictates that evidence of appellant's desire to accept
the plea before the offer expired would be a prerequisite to holding that counsel erred in
not consummating the transaction, and we have none. Again, the record before us is
insufficient to support a holding that counsel acted improperly. 

 Accordingly, the judgment is affirmed.


 Brian Quinn 

 Justice


Do Not Publish.






 
1. The only ground for ineffectiveness mentioned in appellant's issue was that pertaining to the
presentation to the court of the motion for new trial. However, others were alluded to, most often in passing,
in the body of his brief. It is these which we also address, in passing.



HREF="#N_4_"> (4) Its
equipment and parts inventory were sold for cash by auction conducted by Five Star
Auctioneers of Plainview, Texas, on Saturday, January 19, 2002, at Lisco's business
premises in Miami. The advertising conducted in advance of the auction is fully described
in the evidence. Something over 80 people registered at the auction. Witnesses at trial
included Mervin Evans, a Five Star auctioneer and partner, and others who attended. 
Evans described how the day-long auction was conducted, testifying that some items were
sold individually, others by lot. Other witnesses also described the manner of sale. The
record includes the receipts for each individual sale at the auction. Evans also described
the several days of work that was performed to clean the premises and organize the
inventory for auction. The evidence concerning the disposition of the collateral here far
exceeds the meager facts presented in Havins. It thoroughly describes the method,
manner, time, place and terms of the disposition.

 Lisco's parts inventory included some new tractor parts and some rebuilt parts, but
consisted largely of parts obtained by dismantling salvage tractors Lisco bought for that
purpose. The collateral also included many items useful only for scrap, such as the bodies
of dismantled tractors. Part of the inventory was contained in the three buildings located
on Lisco's eight-acre property; other items such as tractor bodies and tires were outside. 

 The trial court heard widely varying evidence concerning the nature and market
value of Lisco's inventory. Garry Lister testified that, sold at his retail sales prices, his
inventory would have brought more than a million dollars. He acknowledged that some
discount would apply to sales to other dealers. Inventory lists and financial statements
Lister had given the bank at different times showed values ranging from $162,000, based
on his cost, to some $769,000, based on his retail sales prices. The bank obtained an
appraisal dated in March 2001 that placed a market value on Lisco's "inventory and
contents" of $125,000. Robert Owens, a long-time owner of a large tractor and auto parts
salvage business in Wellington, Texas, who attended the auction, testified the inventory
should have brought several times the $13,644 gross proceeds, and agreed $84,000 would
"probably be in the ball park." But Owens also testified that he had discussed with Garry
Lister the possibility of participating in an offer to appellee for purchase of the inventory and
the real estate (5) for a total of $100,000, which Owens also termed a "fair price." 

 Arguing the evidence conclusively establishes that the sale was not commercially
reasonable, appellants also point to testimony of appellee's principals Glenn Lee and
Duane Swofford acknowledging they had no experience disposing of collateral of this
nature, and based their decisions concerning its disposition on the advice they received
from Five Star. (6) 

 Appellants rely also on Owens' testimony, and that of Henry Teich, who acquired
some tractor parts at bargain prices at the auction. Teich, who lives near Fort Worth, said
he came to the auction interested in a particular gear assembly for a Case tractor, and
ended up buying eight of the gear assemblies because "they were so cheap." He won the
bidding on several shelves of parts that were sold as lots. One shelf contained two of the
gear assemblies together with many other parts. The used gear assemblies alone would
have cost him $1000 each had he purchased them at a tractor parts dealer. He paid $150
or less for the entire shelf of parts. Teich also testified he bought, as a lot, 26 injection
pumps for $143. He later resold 25 of the pumps to a friend in the injection pump business
for $100 each. 

 Robert Owens also found many bargains. He bought at least ten trailer loads of
parts that he placed into his own inventory, and several truck loads of scrap, spending less
than $2000 in all. He resold the scrap for more than $10,000. In one of his successful
bids, Owens bought a row of ten or twelve "piece tractors," those missing the motor or
other parts, for $1. He estimated his resale value of the parts inventory and salvage from
those piece tractors at between five and ten thousand dollars. 

 Both Teich and Owens expressed the opinion that an auction like that conducted
here was not the proper way to sell such items. (7) Garry Lister, who did not attend the
auction, expressed a similar opinion. (8) Evans testified the sale was commercially
reasonable. He said there was nothing Five Star could have done to make the auction
"better." He testified that transporting the inventory to parts dealers to seek a buyer was
not feasible because of the expense and labor required, and that the widespread
advertising provided "a chance for a lot of people to see it . . . ." Lee testified that, based
on what he was told, he thought most of the inventory was "junk," and that appellee wanted
to sell it in the fastest, most efficient way. Swofford said he "wanted to get it sold at the
fairest price we could get." 

 Appellants' contention focuses on the absence of a larger number of parts dealers
among the bidders. Appellants criticize the auction as a "farm sale." They do not contend
on appeal that the auction's format, date, time or location rendered it commercially
unreasonable, nor do they criticize the conduct of the auction company. (9) The gist of their
argument is that the sales proceeds would have been greater if bidders like Owens and
Teich had faced greater competition from other interested bidders. Owens testified Lisco's
inventory "would have brought a lot more money if more people in my line of business
would have been there." Competition has been recognized as the means to obtaining a
fair price at a public auction. Kolbo v. Blair, 379 S.W.2d 125, 129 (Tex.Civ.App.-Corpus
Christi 1964, writ ref'd n.r.e.). Under Article Nine, a "public" disposition is "one at which the
price is determined after the public has had a meaningful opportunity for competitive
bidding." § 9.610, comment 7. (10) Commercial reasonableness may call for advertising
particular collateral in trade publications. See Liberty Nat'l Bank & Trust Co. v. Acme Tool
Div., 540 F.2d 1375, 1381 (10th Cir. 1976) (citing bank's failure to advertise oil rig in trade
journals). 

 The auction was advertised in the Amarillo newspaper, and those of Pampa, Borger
and other area towns. It was advertised also in the High Plains Journal, a Kansas
publication Evans testified is distributed over several states. The auction was further
advertised, together with other scheduled Five Star auctions, in the company's auction
circular, mailed to some 28,000 recipients. Evans testified 128 more circulars were mailed
to individuals and dealers at addresses obtained from Lisco's mailing list and from trade
magazines found at Lisco's offices. The circular's page-sized advertisement described the
auction as selling the real estate, equipment and tractor parts of a "large tractor salvage
co., thousands and thousands of parts." It contained lists further describing the parts and
other items to be sold. 

 Owens testified that he was the only parts dealer at the auction, (11) and that other
dealers should have been invited to the sale. He specifically mentioned parts dealers in
several Texas cities and others in Oklahoma. Owens also testified, though, that he
received the circular advertising the Lisco auction, that Five Star "does lots of advertising,"
and that he had advertised his own business in their brochures. Evans's testimony and the
list of 128 addresses to which circulars were mailed indicate that a number of other parts
dealers, including three of those specifically mentioned by Owens, received circulars. 
Other testimony provided a possible explanation for a lack of interest on the part of some
dealers. Garry Lister testified he contacted several dealers during the months before
appellees took possession of his inventory, but those dealers were "pretty much stocked
up at the time." Owens also acknowledged that, if sale prices had been higher, he
"probably wouldn't have been as good a buyer." Evans testified that a low price for scrap
metal "greatly" affected the bids received for scrap items. 

 Testimony indicates the collateral auctioned varied from the parts having values like
those described by Teich, to scrap like that bought and resold by Owens, to items that
were purchased at the auction but still had not been removed from the Lisco property by
the time of trial. 

 Although the proceeds obtained from the auction seem low, (12) we cannot agree that
appellee's inexperience in disposition of this type of collateral or the failure of many parts
dealers to attend the auction despite wide advertising conclusively establishes the
disposition of the inventory was commercially unreasonable. We conclude that, on the
evidence presented, reasonable people could differ in their conclusions concerning the
commercial reasonableness of the auction of Lisco's inventory. City of Keller, 168 S.W.3d
at 816. In this bench trial, the trial court was the sole judge of the credibility of the
witnesses and the weight to be given their testimony. Sterquell v. Scott, 140 S.W.3d 453,
461 (Tex.App.-Amarillo 2004, no pet.). We also conclude that the trial court's implied
finding that appellee's disposition of the collateral was commercially reasonable is not so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. 
Maritime Overseas Corp., 971 S.W.2d at 406-07. Accordingly, we find the evidence
supporting that finding both legally and factually sufficient, and overrule appellants' issues
contending otherwise. The trial court's judgment is affirmed.

 



 James T. Campbell

 Justice
1. All citations to sections in this opinion are to Tex. Bus. & Com. Code Ann. (Vernon
2002). Texas adopted a revised Article Nine (entitled Uniform Commercial Code-Secured
Transactions), effective July 1, 2001. § 9.101 et. seq. The revised law is applicable to
appellee's deficiency action, filed May 13, 2002. §§ 9.701, 9.702. Section 9.610 of the
revised law retains the requirement that disposition of collateral be commercially
reasonable, stated in § 9.504(c) of the prior statute. 
2. The sufficiency of appellee's notification of its intended disposition of the collateral
is not at issue. 
3. Like former § 9.504, § 9.610 does not define the term commercially reasonable.
Case law applying the term under former Article Nine should generally remain applicable. 

4. It was elsewhere described as a large tractor salvage company. Lisco sold tractor
parts to farmers and other individuals. Garry Lister testified that Lisco also sold parts to
dealers in other states through a network of salvage dealers. He also testified he received
invitations to bid on inventory items being offered by other dealers. 
5. Appellee previously had purchased the real estate for $75,000 at a nonjudicial
foreclosure. The commercial reasonableness of that sale is not challenged. The real
estate was offered at the auction, but no acceptable bid was received.
6. Swofford said he was "not in the parts business, he was in the note business."
7. Teich proposed that the best price for the inventory would have been obtained by
an effort to market the different categories of parts to specialized buyers, giving his
success in selling the injection pumps as an example. He acknowledged that effort could
take months. He also opined that some items could have been marketed over the internet.
8. Garry Lister testified that the collateral should have been marketed to other parts
dealers, not to farmers, who typically are interested in buying only a single part. 
9. Five Star partner Evans testified that Five Star conducts about 80 auctions a year,
over a large area of west Texas, mostly "farm related." Owens called Five Star "very good
auctioneers."
10. Comment 7 goes on to state that a "meaningful opportunity" implies that "some
form of advertisement or public notice must precede the sale . . . and that the public must
have access to the sale . . . ." Id.
11. Teich testified there were two parts dealers at the auction. Teich also said two
other bidders, "a gentleman from Arkansas and a local . . . salvage dealer," bid on parts
he bought. 
12. See § 9.627, U.C.C. comment 2, noting "[t]he law long has grappled with the
problem of dispositions of . . . property which comply with applicable procedural
requirements (e.g., advertising, notification to interested persons, etc.) but which yield a
price that seems low."