ACCEPTED
03-17-00322-CR
21309556
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/14/2017 7:57 PM
JEFFREY D. KYLE
CLERK

# CAUSE NO. 03-17-00322-CR

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/4/2018 8:00:00 AM
JEFFREY D. KYLE
Clerk

## IN THE COURT OF APPEALS,
## THIRD SUPREME JUDICIAL DISTRICT

_____

## RODERICK PAYTON
## Appellant
## v.
## THE STATE OF TEXAS

_____

**Cause No. D-1-DC-16-301681, Travis County, Texas, 147th Judicial District Court, Honorable Clifford A. Brown, presiding**

_____

## BRIEF FOR APPELLANT

Christopher P. Morgan
State Bar No. 14435325
3009 N. IH 35
Austin, Texas 78722
(512) 472-9717 // FAX:    472-9798
chrismorganlaw@cs.com
ATTORNEY FOR APPELLANT

## NAMES OF PARTIES/ATTORNEYS

Roderick Payton                          Appellant

Michael Watson                     Attorney for appellant at trial
SBOT#24060804
608 West 12th Street
Austin, Texas 78701

Christopher P. Morgan          Attorney for appellant on appeal
SBOT#14435325
3009 N. IH 35
Austin, Texas 78722
chrismorganlaw@cs.com

Hon. Margaret Moore           Attorney for the State
District Attorney
Travis County

Jeremy Sylestine                 Attorney for the State at trial
Assistant District Attorney
SBOT# 24046941
Travis Count Attorney's Office
314 West 11th Street
Austin, Texas 78701

Jeremy Sylestine                 Attorney for the State at trial
Assistant District Attorney
SBOT# 24077152
Travis Count Attorney's Office
314 West 11th Street
Austin, Texas 78701

**TABLE OF CONTENTS**  PAGE

NAMES OF PARTIES/COUNSEL  i

TABLE OF CONTENTS  ii

INDEX OF AUTHORITIES  v

STATEMENT OF THE CASE  1

POINTS OF ERROR  2

SUMMARY OF ARGUMENT  3

STATEMENT OF FACTS  4

ARGUMENTS AND AUTHORIES  5

POINT OF ERROR NO. 1: THE COURT COMMITTED FUNDEMENTAL ERROR IN THE GUILT/INNOCENCE JURY CHARGE BY FAILING TO APPLY THE LAW OF PARTIES TO THE FACTS.  5

POINT OF ERROR NO. 2: THE COURT COMMITTED FUNDEMENTAL ERROR IN THE GUILT/INNOCENCE JURY CHARGE BY AUTHORIZING CONVICTION WITH- OUT REQUIRING FINDING BEYOND A REASONABLE DOUBT THAT APPELLANT POSSESSED THE SPECIFIC INTENT TO CAUSE BODILY INJURY TO HARRIS.  5

POINT OF ERROR NO. 3: THE COURT COMMITTED FUNDEMENTAL ERROR IN THE GUILT/INNOCENCE JURY CHARGE BY AUTHORIZING CONVICTION WITH-

OUT REQUIRING A UNANIMOUS VERDICT ON ALL
ESSENTIAL ELEMENTS OF THE CHARGED OFFENSE.    5

   A.  The errors in the charge.                          6

      1. The indictment.                               6

      2. The evidence.                                 7

         a. Robin Harris.                           7

         b. Officer Venassa Jimenez.               13

         c. Jennifer Mezei.                        14

         d. Babaji Jude Leonard.                   15

         e.  APD Detective Rolando Gutierrez.      16

         f. Leah Reese.                            19

         g. Appellant.                             19

      3. The jury charge as a relevant whole.          29

      4. The charge erroneously failed to include any
reference to  guilt as a party in the application
paragraph.                                           32

      5. The charge erroneously failed to apply the law
of parties to the facts.                             34

      6. The charge erroneously authorized conviction

without any finding beyond a reasonable doubt on the essential element that appellant possessed the required specific intent of "caus[ing] bodily injury to Robin Harris".                               34

7. The charge erroneously authorized conviction without a *unanimous* finding beyond a reasonable doubt on that essential element.                               34

  B. Egregious Harm.                               40

    1. The jury notes.                               40

    2. The entire jury charge.                               42

    3. The state of the evidence, including contested issues.                               42

    4. Voir dire and arguments of counsel.          44

      a.  The voir dire of the venirepanel.                               47

      b. Opening arguments.                               48

      c. Closing arguments.                               52

PRAYER FOR RELIEF                               53

CERTIFICATE OF SERVICE                               53

CERTIFICATE OF WORD COUNT                               53

APPENDIX                               54

**INDEX OF AUTHORITIES**                    **PAGE**

**Cases**

Almanza v. State, 686 S.W.2d 157(Tex.Crim.App.1985)(On
    reh'g)          6

Barrios v. State, 283 S.W.3d 348(Tex.Crim.App.2009)     6

Binyon v. State, 545 S.W.2d 448(Tex.Crim.App.1976)     39

Brown v. State, 716 S.W.2d 939(Tex.Crim.App.1986)     33

Brown v. State, 595 S.W.2d 550(Tex.Crim.App.1980)     36, 39

Bustamante v. State, 106 S.W.3d 738(Tex.Crim.App.2003)     36

Castillo-Fuentes v. State, 707 S.W.2d 559(Tex.Crim.App.1986) 40, 42

Cienfuegos v. State, 113 S.W.3d 481(Tex. App.-Hou[1st]
    2003, pet ref'd)          37, 39

Cooper v. State, 430 S.W.3d 426(Tex.Crim.App.2014)     34, 40

Crenshaw v. State, 378 S.W.3d 460(Tex.Crim.App.2012)     34

Ex parte Hawkins, 6 S.W.3d 554(Tex.Crim.App.1999)     35

Ferreira v. State, 514 S.W.3d 297(Tex.App.-Hou[14th]2016,
    no pet.)          32, 35

Garza v. State, 937 S.W.2d 569(Tex.App.-San Antonio 1996,
    pet. ref'd)          36

Granados v. State, 843 S. W.2d 736(Tex.App.-Corpus
    Christi1992, no pet.)          22

Green v. State, 840 S.W.2d 394(Tex.Crim.App.1992)     36

Griego v. State, 345 S.W.3d 742(Tex.App.-Amarillo2011, no
    pet.)          22

Gross v. State, 380 S.W.2d 181(Tex.Crim.App.2012)     39

Jefferson v. State, 189 S.W.3d 305(Tex.Crim.App.2006)     40

King v. State, 157 S.W.3d 873(Tex.App.-Houston[14th Dist.]
    2005, pet. ref'd)          36

Landrian v. State, 268 S.W.2d 532(Tex.Crim.App.2008)     34, 36, 40

Matlock v. State, 20 S.W.3d 57(Tex.App.-Texarkana2002, pet.
    ref'd)          36

Malik v. State, 953 S.W.2d 234, 234(Tex. Crim.App.1991)     32

Nava v. State, 415 S.W.3d 289(Tex.Crim.App.2013)      37, 39

Peraza v. State, 457 S.W.3d 134(Tex.App.-Hou[1st]2014),
*rev'd on other grounds*, 467 S.W.3d 508(Tex.Crim.
App.2015)      22

Pizzo v. State, 235 S.W.3d 711(Tex.Crim.App.2007)      40

Plata v. State, 926 S.W.2d 300(Tex. Crim.App.1996),
*overruled on other grounds*, Yzaguirre v. State, 394
S.W.3d 526(Tex.Crim.App.2013)      32, 35

Price v. State, 457 S.W.3d 437(Tex.Crim.App.2015)      36, 38

Purser v. State, 902 S.W.2d 641(Tex.App.-El Paso1995, pet.
ref'd)      36

Ruiz v. State, 753 S.W.2d 681(Tex. Crim.App.1988)      42

Solomon v. State, 49 S.W.3d 356(Tex.Crim.App.2001)      39

Stuhler v. State, 218 S.W.3d 706(Tex.Crim.App.2007)      40

Vasquez v. State, 389 S.W.3d 361(Tex.Crim.App.2012)      6, 32, 35

Wolfe v. State, 917 S.W.2d 270(Tex.Crim.App.1996)      36

Yarbrough v. State, 656 S.W. 2d 200(Tex.App.-Austin 1985,
no pet.)      36

**Statutes and Rules**

*Tex.PenalCode*, Sec. 7.02(a)(2)      36, 52

Sec. 7.02(b)      37, 52

Sec. 29.02(a)(1)      1, 35, 36

Sec. 29.03(a)(2)      39

*Tex.R.Ev.,* Rule 201      22

**CAUSE NO. 03-17-00322-CR**
**IN THE COURT OF APPEALS, THIRD-SUPREME JUDICIAL**
**DISTRICT**
_____

**RODERICK PAYTON**
**Appellant**
**v.**
**THE STATE OF TEXAS**
_____

**Cause No. D-1-DC-16-301681, Travis County, Texas, 147th Judicial District**
**Court, Honorable Clifford A. Brown, presiding**
_____

**BRIEF FOR APPELLANT**
_____

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

COMES NOW, RODERICK PAYTON, appellant, by and through his under-

signed counsel, and presents his brief to the Court:

**STATEMENT OF THE CASE.**
On or about May 8, 2017, appellant, on plea of not guilty, was convict-

ed by jury of Aggravated Robbery, a 1st degree felony. *Tex.PenalCode*, Sec.

29.02(a)(1), 29.03(a)(2).  The jury sentenced him to 10 years Texas Department

Criminal Justice- Institutional Division, no fine, recommending it be probated

for 10 years.  The trial court purported to add condition of 180 days 'shock pro-

bation'.  (The written *Judgment of Community Supervision* on May 30, 2017,

incorrectly states jury was waived, plea of 'guilty' entered, Defendant convict-

ed and sentenced thereon.) On May 26, 2017, the Court re-sentenced appellant,

removing  the 'shock probation' condition and releasing Defendant onto

1

probation. RR12(May 26, 2017).

Defendant's original *Notice of Appeal* was filed May 8, 2017. An *Amended Notice of Appeal* and *Motion of time to file Notice of Appeal* was filed on June 29, 2017. That motion was granted on July 19, 2017. The Clerk's record was filed July 7, and the reporter's record on July 12, 2017.

After extensions, this brief was due November 27, 2017. On December 13, 2017, appellant's motion requesting extension to December 12, 2017, was dismissed as moot and the appeal ordered abated for hearing by January 19, 2018. A motion to set aside that order, reinstate the appeal and extended the time for filing this brief to this date is filed on the same date as this brief.

## POINTS OF ERROR

**POINT OF ERROR NO. 1: THE COURT COMMITTED FUNDEMENT-AL ERROR IN THE GUILT/INNOCENCE JURY CHARGE BY FAILING TO APPLY THE LAW OF PARTIES TO THE FACTS.**

**POINT OF ERROR NO. 2: THE COURT COMMITTED FUNDEMENT-AL ERROR IN THE GUILT/INNOCENCE JURY CHARGE BY AUTHORIZING CONVICTION WITHOUT REQUIRING FINDING BEYOND A REASONABLE DOUBT THAT APPELLANT POSSESSED THE SPECIFIC INTENT TO CAUSE BODILY INJURY TO HARRIS.**

**POINT OF ERROR NO. 3: THE COURT COMMITTED FUNDEMENT-AL ERROR IN THE GUILT/INNOCENCE JURY CHARGE BY AUTHORIZING CONVICTION WITHOUT REQUIRING A UNANIMOUS VERDICT ON ALL ESSENTIAL ELEMENTS OF THE CHARGED OFFENSE.**

**SUMMARY OF ARGUMENT**

Appellant argues the guilt/innocent jury charge, taken as a relevant whole, is fundamentally erroneous. It does not include any reference to parties in the application paragraph, wholly fails to apply the law of parties to the facts, does not require the jury find beyond a reasonable doubt that he possessed the specific intent to cause bodily injury, an essential element of the indicted offense, or require it find that essential element unanimously, and authorizes conviction even if the jury did not so find or did so non-unanimously. This caused "egregious harm" to appellant.

**STATEMENT OF FACTS**

At about 3 a.m. on March 25, 2016, Robin Harris was sitting in his car in a parking lot in front of the credit union at 11th Street and the east frontage road of IH35, in Austin, Texas, when appellant knocked on and opened his passenger-side door and spoke to him. Some moments later, Herron opened the drivers-side door and hit Harris in the left temple with his hand. A struggle ensued between Harris and Herron, and at one point Harris saw Herron had a knife in his hand. Herron told him to get out and get on the ground and Harris did so.

Appellant then came around to the driver' side and searched the car interior, while Herron stood by Harris with the knife held about level with

Harris' head.  After that, appellant came over to them, stood there.  One of

went through Harris' call phone, then asked for the passcode for his bank app.

He gave it to them.  Herron demanded his wallet, and he gave it to him.  Herron

then gave appellant a bank card from it.

Appellant walked over the credit union, where there appeared to be an

ATM.  He did not return any money.

Harris said appellant then told Herron to start the car, and appellant had

the knife and was standing by the kneeling Harris while Herron tried to do so.

Herron could not started it, so appellant switched places with him and started it.

He then moved to the passenger seat and Herron got in the driver's and tried to

drive the car away.  However, it stalled and rolled back into a poll, whereupon

they left on foot.  Harris then got into his car and drove away, flagging down a

police officer thereafter.  He never recovered his phone, wallet (along with a

few dollars, some IDs and business cards) and a key fob for the car.

Harris testified that, after Herron got him out of the car, appellant came

around to the driver's side and told Herron to "cut his throat" if he moved.  He

also said that when they demanded his bank passcode, appellant told him "'If

you give me the … wrong code, I'm going to kill you'".

Appellant denied making either statement.  He also denied he ever had

the knife, told Herron to start the car and the other things Harris said he did. He also denied he intended to commit robbery, or be a party to one with Herron, and did not know Herron would, or intend for him to, hit Harris or cause him bodily injury.

Instead, he said he was walking to a girl's house in east Austin and Herron invited himself along. Herron had a 'teardrop' tattoo on his face, which he understood to be a claim he had killed someone, and was a gangmember. At one point, it looked like Herron used some drugs and thereafter seemed to be 'tripping".

When they walked east on the bridge over IH35 at 11th Street, a car similar to Harris' almost hit Herron. When they saw Harris' car, Herron said he was "going to check" it "out", but appellant told him to wait there and went to talk with Harris instead. When he began speaking to Harris, Herron came up on the driver's side and hit Harris. At that time, appellant saw that Herron had a knife. He said his actions after that were because he was scared Herron stab, beat up or otherwise injure him as he had Harris.

## ARGUMENTS AND AUTHORIES

**POINTS OF ERROR NOS. 1 TO 3.**

Review of jury charge error is a two-step inquiry: 1) was it error; and 2)

if so, was it preserved? <u>Barrios v. State</u>, 283 S.W.3d 348, 350(Tex.Crim.App. 2009). If not objected-to or otherwise raised at trial, reversal is required only for "egregious" harm. <u>Almanza v. State</u>, 686 S.W.2d 157(Tex.Crim.App.1985) (On reh'g). Errors that deny a "fair and impartial trial", "go to the very basis of the case", "deprive the defendant of a valuable right", or "vitally affect [a] defensive theory" cause egregious harm. *Id*., at 172. Whether egregious harm occurred is a fact specific determination, based on 1) the entire jury charge, 2) the state of the evidence, including contested issues, 3) arguments of counsel, and 4) any other relevant information contained in the record as a whole. *Id*., at 171; <u>Vasquez v. State</u>, 389 S.W.3d 361, 371-372(Tex.Crim.App.2012).

### A. The errors in the charge.

#### 1. The indictment.

The indictment alleged relevantly that:

> "RODERICK PAYTON, on or about the 25th day of March, 2016, and before the presentment of this Indictment, in the County of Travis, and State of Texas, did then and there, while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally, knowingly, or recklessly cause bodily injury to Robin Harris by striking Robin Harris with his fist and hand, and the said RODERICK PAYTON did then and there use or exhibit a deadly weapon, to-wit: a knife,…"

CR-13. Appellant was arraigned and pleaded not guilty at RR3-9.

## 2. The evidence.

### a. Robin Harris.[1]

Around 2:30 p.m. on March 25, 2016, Harris parked his black 2015 Volkswagen Jetta in a parking lot in front of the credit union at east 11th street and the east frontage road of Interstate 35, "facing toward the street, toward IH 35." RR3-41, 43-44, 51.[2] He was alone. RR3-51.

He testified on direct that the incident began thus:

> "I was approached on the passenger side of the car, and a gentleman opened the passenger's side door, looked at me for a couple of seconds, and then another person opened the driver's side door. They - I fought with him for a few seconds and then got out of the car. I was hit… in the temple… I got out of the car. I – I was told to get on the ground and hand over my wallet."

RR3-49. He said he did not see them approach his car as he had his "phone in his hand at that time", and was "probably on the Internet." RR3-81-82.

He ultimately identified the first man as appellant. RR3-71-73. He described them as black men with "very distinctive" differences, and appellant was significantly larger than Herron. RR3-52-53, 63.[3]

---

[1]/ Harris was actually the second witness, but is presented first for clarity of argument.

[2]/ Photos of the car were admitted as SX-3. RR3-44. A 'Google Earth" image of the lot was admitted as SX-68, and he described various features at RR3-47-48.

[3]/ He said neither tried to hide their face and he got a good look at both. RR3-61. He got "the best look at the first guy, the bigger guy,… when he opened the door of the car." RR3-61, 73. He "was larger…, had longer hair," "down to about his shoulders or a little bit below, braided hair", "darker skin,… more heavy-set", and "was wearing long pants and.. a T-shirt that said 'Two Men and a Truck' on the back." RR3-52-53, 62. On direct, he said he was

On direct, he testified appellant did not speak until after he got out of the car and got on the ground as directed by Herron. RR3-53-54. But on cross, he ultimately agreed that on the day of the incident he told police appellant did say something when he opened the door, but he did not "remember what." RR3-80-81. He then claimed "they together tried to force me out of the car" after Herron hit him and he saw the knife, "that's when" Herron "said, 'Get out of the car." RR3-82. He said Herron opened the door and immediately got physical and punched him in the left temple (the side facing Herron). RR3-82-83. When the State on redirect asked how appellant "tried to force" him out of the car, he said (for the first time):

> "As soon as my driver's side door was opened, and he saw… his partner there, he reached in and – and tried to start releasing my seatbelt, and the other guy was grabbing me or trying to get me out of the car. And – and at some point in there, that's when the guy on the driver's side hit me in the head."

RR3-87.

---

"pretty sure" he was "over 200 pounds"; on cross, he put it "probably closer to 6'5" and… 300 pounds", and looked the same at trial.. RR3-62, 84. The second man "was a little bit skinny, closer to" his size (5'8", 185 pounds), "had shorter hair" and "little bit lighter skin", and was wearing a "hooded sweatshirt – or jacket." RR3-52, 62.

Some months later, APD detectives told him they told him they "had fingerprint matches from the car", and asked him to do photo 'lineups'. RR3-70. He said he had not seen either before that night and there was no reason their prints should been on his car. RR3-51, 70-71. He met with Gutierrez and viewed six photos for each suspect. RR3-71-72. He identified appellant as the first/larger man with "95 percent" certainty. RR3-72-73.

He was explicit that Herron was the one who struck him in the head, and that was the only time he was hit. RR3-54-55.  He did not know if he was hit with a hand or the knife, but "assume[d]" it was the knife. RR3-55, 83.  He didn't realize he had been hit until he was kneeling on the ground and "there was a puddle of blood." RR3-83. *See also*, RR3-85.[4]

He then testified that, after he got on the ground, the one "who came up to the car first said, 'If he moves, cut his fucking throat.'" RR3-53-54. *See also*, RR3-74.  At that time, Herron was "standing there over [him] with a knife." RR3-54.

Appellant then searched his car, got his phone, and "came over to the other side of the car and stood there over me going through my phone", then asked for the passcode for his bank app. RR3-56.  Harris said he then "said, 'If you give me the wrong'—'wrong code, I'm going to kill you', so" he "gave him the right number." *Id*.  On direct, he testified "one of them" asked for his wallet "and they started going through [it] and took my bank card." RR3-56-57. On cross, he said Herron "was the one [he] handed [his] wallet to" and took the

---

[4] He did not notice the knife until "after [he] struggled with" Herron "for a few seconds, and… he had already hit me in the head", when Herron "held it where" he "could see it,.… looked like he was trying to show it to me and … that's when I decided to go ahead and get out of the car." RR3-55.  He did not feel the knife against his body any other time. *Id*.  He described it as "a folding knife", "maybe four or five inches long, had a mental handle," and "a greenish color." RR-55-56.  He did not remember "exactly" if his injury was "throbbing", but it was painful. *Id*.

bank card out and gave it to appellant "eventually". RR3-79.

Appellant "went over to the bank ATM." RR3-57.  Harris insisted he "decided to go to the ATM on his own." RR3-74-75.  He testified on direct that he returned "[a]fter two or three minutes", but on cross agreed his March 25, 2016, statement to police said appellant was gone for only about a minute, which he "would assume" was not long enough to get money. RR3-57, 75-76. He agreed appellant never actually got any money from the ATM, despite having the correct PIN. RR3-74, 76.

He testified on direct that appellant then told Herron "to get in the car and… start it." RR3-57.  Herron "said he did not know how to drive", and appellant "said, 'Just get in, and I'll figure it out.'… so he got in" but "couldn't figure out how to start the car." *Id*.  According to him, appellant "was standing next to" him during this and "they had traded the knife. *Id*.  He said he held the knife "[a]bout the same as the other guy", across his body, blade open and facing out, "about even with"  Harris' head when he was kneeling. RR3-58-59. He was clear that Herron was the one "standing there next to" him, "holding the knife on" him before that. RR3-57-58.

Appellant asked Harris how to start the car, and he told him but "they still had trouble with it", so

"they switched the knife again, and I – I moved – the bigger guy – well, the smaller guy was trying to start the car. The bigger guy had me move to the other side of the car and to the -- to the rear passenger side and stay there. And the smaller guy couldn't get the car started, and so they switched again and – and the bigger guy got in the car and got it started."

RR3-63, 65. He said appellant "was there the whole time watching" Herron try to start and drive the car, but he did not "recall" him saying anything else during that. RR3-65-66.

Appellant then "got out of the car, went around to the passenger side and got in. And [Herron] got in and tried to drive the car." RR3-64. *See also*, RR3-86. Ultimately, the car rolled back and hit a pole by the bank, and "they gave up on it and left." RR3-64-65. The two walked south, "along the frontage road", but he did not see where they went after that. RR3-67.

Harris "left immediately" in his car and ended up flagging down officer Jimenez. RR3-67-68. He was ultimately treated by EMS and Brackenridge hospital, who put some gauze and glue on his wound. RR3-68-69. He said he was not evaluated for a concussion and did not have one. RR3-69. He believed he clearly remembered what happened. *Id*.

His phone, wallet and everything in it ("a few dollars, maybe $5", ID, driver's license, military ID, and a few business cards) was taken. RR3-50, 66. One of two key fobs for the car was also missing. RR3-67. No other property

was taken, and his bank and credit/debt cards were left in the car. RR3-50, 84-85. *See also*, SX-30-37. His phone was not used after that. RR3-85.

The State also elicited that he was "scared" and thought "they were serious about being willing to… kill" him. RR3-60. He testified the incident from start to finish, "lasted between 10 and 15 minutes." RR3-60.

According to Harris, "there seemed like they -- there was a very little amount of planning" by them. RR3-80. But, there was nothing that made him think they were not acting together, "they were talking to each other, and" appellant "seemed to be in charge of the… whole thing". RR3-60-61.

> "He was doing most of the talking, telling the other guy what to do and… the smaller guy didn't seem to do anything without the other guy telling him what to do."

RR3-61-62. *See also*, RR3-73. He added later that he saw was no indication that appellant was an "unwitting participant", and he never said anything indicating he was surprised by Herron's acts or that there was a knife being held near him, or told Herron to stop. RR3-88-89. He thought appellant was directing most of it, encouraging it, and helping Herron. RR3-89-90.

The defense elicited that, instead of being able to see if appellant was surprised Herron had a knife, Harris was focused on Herron and the knife. He "resisted at first" when Herron grabbed him, and was trying to hit and defend

himself against him. RR3-89.  He agreed his focus was on Herron, and then on him and the knife once he saw it. RR3-90.  "When I moved to get out of the car, he backed up a little bit, so I didn't have to be – have 100 percent of my attention on the knife." *Id*. [5]

### b. Officer Vanessa Jimenez.

Austin Police Department (hereafter 'APD') patrol officer Jimenez testified she was flagged down by Harris at 8th and Neches in the early morning of March 25, 2016. RR3-22-23, 25, 27.[6]  He was "very bloody" and "agitated". RR3-28.  He was on foot, but she saw he had a 4-door Volkswagen car. RR3-28-29.

Harris described the incident and gave a description of the suspects. RR3-28-29.[7]  She called for EMS, backup officers and detectives, and the "CSU to process the scene". RR3-30.  EMS ultimately transported Harris to Brackenridge hospital and she transported him back to the scene afterwards. RR3-30.  Digital photos of Harris from that night were admitted as SX-1 and 2,

---

[5]/ In addition, he first insisted he had been parked for "10 or 15 minutes" before appellant approached, but shifted to not "recall[ing] exactly how long" when confronted with the video's timestamp showing it was 5 or 6 minutes. RR3-78.  He did not remember the route he took to the lot, but thought he had "probably" taken the IH35 frontage road from the UT area, where his last fare was, then east on 11th over the bridge. RR3-78-79.

[6]/ She added that this was in Travis County, Texas. RR3-25.

[7]/ Objection to her relating that he told her "somebody had just robbed him" was sustained. RR3-28.

and show blood on his shirt and face, and a laceration and bump on his left temple. RR3-32-33.

The defense elicited that various parts of the "downtown area" were "high-crime" areas, including the "ARCH", a homeless shelter where "lots of people congregate" and "lots of drugs" are available. RR3-33-35. That includes "K2", and a drug "similar to K2" consisting of a "cigarette or joint [] dipped in embalming fluid" or nail polish. RR3-35. Its effects vary widely, from "very agitated" to "really… slow", acting "like they're not even there, like they're in a completely different world", "blank stares,… like they don't know where they are. RR3-35-36. "It's pretty common" around the ARCH. RR3-36-37.

It also elicited that Harris had "a little more blood" on his face and blood on his hands when they first spoke, but "already wiped some" when the photos were taken. RR3-38-39. She was concerned he had a concussion, and opined a concussion could affect memory "later on, like, kind of make their memory not as accurate", but "not at the time." RR3-39-40.

### c. Jennifer Mezei.

Mezei, a senior crime scene specialist with APD, photographed the scene, Harris, the exterior and interior of his car, and processed various surfaces of the car and things in it for latent prints. RR3-92, 96-98, 104-109; SX-4-

45. She submitted 15 latent cards for testing. SX-4-46. Latents were obtained from the exterior and interior driver door, interior driver door handle, exterior front passenger door and window, interior front passenger side door, trim about the exterior front passenger door, backside of the front passenger exterior door handle, the front passenger interior door handle, exterior rear passenger door, exterior rear passenger window, gear-shifter and the bottom of the Altoids box. RR3-111. She also processed the front seatbelts and seatbelt buckle, but did not obtain any prints. RR3-110-111.[8]

### d. Babaji Jude Leonard.

Leonard, an emergency medical technician, treated Harris. RR3-113-116. The injury was "hemorrhage", "bleeding and swelling", and he received the "basic level of care" and was transported to Brackenridge hospital. RR3-118-119.[9] Harris told him he "was drug from an automobile and stuck in the head" with fists. RR3-1120-121. Leonard agreed knives "in the way they are used"

---

[8]/ SX-13, 16, 25, 30, 35-39, 42-43, show damage on the car's left rear where it struck the pole, the glove box open with items on the passenger seat, and Harris' temple injury after treatment, RR3-99-104. SX-44 and 45 show some redness on his left shoulder, but there is no evidence proving its cause.

She also swabbed of "some red stains" on the driver's side interior that "appeared to be blood to" her, but did not know if the they were tested. RR3-105. She swabbed various parts of the interior for DNA: the gear shift, emergency brake, steering wheel, handle grip on the passenger side, glove box latch and center console latch. RR3-104-105.

[9]/ He was dispatched at 3:21 a.m., and arrived at 3:49. RR3-118. His report was admitted as SX-53. RR3-116-117.

are "sometimes deadly weapons", and "can be used without a doubt to cause serious bodily injury or death." RR3-122.

He added on cross that some parts of downtown Austin, including the ARCH, are "high crime areas" where he responded "many times", "some" for drugs, including K2. RR3-123-124. K2's effects "range from passive lethargy to excited delirium", "certainly" can be dangerous to use, and is nothing like marijuana. RR3-124.

### e. APD Detective Rolando Gutierrez. [10]

Gutierrez secured a copy of a surveillance video from the credit union "camera facing the western portion" of the parking lot that borders the north-bound IH35 frontage road. RR3-133-136; SX-54. He testified the cameras are visible from outside, and he could tell they were security cameras when walking to the building. RR3-143-144.[11]

The video is not "high-quality" and is "kind of jerky or … stop-motion", not "a continuous stream", "like, every five or seven seconds and then will stop, like, a pause and then continue recording". RR3-134. There is no audio.

---

[10]/ He was in the burglary unit at time of trial, but was with the violent crimes division of the robbery unit on March 25, 2016, RR3-126-127, 133.

[11]/ He opined that there was no other angles or cameras that provided any more detail or were otherwise helpful. RR3-144.

16

RR3-137.  He thought the timestamp "possibly might" be "off by an hour", e.g.
2 a.m. was actually 3. RR3-138.  He added that it "doesn't give [] details, but
its enough to corroborate" Harris' "version of events." RR3-140.

The relevant part is about 15 to 16 minutes. RR3-142.  Harris' car pulls
into the parking lot at about timestamp 2:51 a.m. RR3-138-139.  At some point
after that it shows two people who "appeared to be [the] suspects": "a shorter
thinner-built male, with short hair", dressed in all black; and "a bigger, stockier
male with what appeared to be longer hair, possibly the dreadlocks as describ-
ed", and a white shirt or jacket around his waist. RR3-140-142, 162.  He opined
on cross that the first was Herron and the second appellant, but could not
recognize them from "the video alone". RR3-161-162.

A person appears to walk by at timestamp "2:14 and about 30 seconds",
"before walking on the sidewalk area". RR3-140-141.  He later identified him
as appellant. RR3-162.  He appears to be walking back to the car at 2:14:35.
RR3-163.  The video then jumps from 2:14:35 to 2:15:20, or about 45 seconds,
at which time Harris is on the ground by the tree with Herron standing over
him. *Id*.  Appellant is not visible, and Gutierrez agreed he was probably in the
car then. *Id*.

"[A]round the 2:18 timestamp", the men tried to drive the car but it

stalled and rolled back into a light post ("at 2:21"), and they "took off on foot towards 11ᵗʰ Street." RR3-141.  Harris got into his car and drove away at 2:23. RR3-141-142.

The State elicited that the ATM "is actually" on the "opposite side" of the credit union from the parking lot, "through the drive through teller lanes", and the fixture on the parking lot side "appears to be a night deposit box" that "at one time may have served as an ATM". RR3-143.

When asked on cross about the apparent conflict between that 45 seconds showing appellant near the 'ATM' then jumping to Herron standing over Harris and Harris' claim that, during that time, appellant came back from the ATM, got the knife from Herron. Spent some time standing over Harris and then got back in the car, Gutierrez replied:

> "Well, it could be that maybe at one point Herron had the knife and then [] Payton went to the vehicle and handed the knife and  -- in a situation like that, it's traumatic.  Mr. Watson (sic) didn't notice that Herron was now holding the knife.  The last person he saw holding it was [Payton]. All he knew is that these two suspects were passing back the knife, and he that they were armed."

RR3-172-173.  He also testified Harris said appellant had "possibly" tried to make calls with Harris' phone. RR3-165, 169-170.[12]

_____

[12]/ He also agreed it  "would have been helpful" to have the call records, but police did not look for or get any.  They did try to get tracking information "via its tracking application", but could not get any.

He did not think the robbery was planned, but was a "target of opportunity" and "just random." RR3-169.[13]

**f. Leah Reese.**

Reese, an APD latent print examiner, testified relevantly that "some" latent prints in this case were identified as appellant's: i.e., on the bottom of the "Altoids box" found in the passenger seat of Harris' car, the front passenger interior door handle, the exterior front passenger window, and the exterior rear passenger side door and window. RR3-174-178, 186-192, 194-197; SX-46-52, 62. Herron's prints were identified on the interior driver's door handle, the trim above the exterior front passenger door, and the exterior front passenger side door. *See*, SX-57-62, admitted at RR3-192-193. Neither was linked to the prints from the gear shifter, interior driver's door, exterior driver's door or interior front passenger side door. *See*, SX-62.

**g. Appellant.**

Appellant grew up in rural Mississippi, except for a year in Austin when

---

[13]/ He also testified on the line-ups: On August 31, 2016, he learned hits were obtained for appellant and Herron on the latent prints. RR3-147-148, 152, 160. He then composed two photo line-ups, which Harris viewed on September 1, 2016. RR3-145-152, 164. He also interviewed Harris at that time. RR3-164. Harris identified Herron with "75 percent certainty" and appellant with "95 percent certainty". RR3-152-153. The line-ups documents were admitted and published as SX-55 (appellant) and 56 (Herron). RR3-153-160.

The DNA swabs taken by Mezie were never sent for analysis or processed. RR3-145-146.

he was middle school. RR3-202-203.  He moved back to Austin in 2012. *Id.*

He testified he was on 6th Street late in the night of March 24, 2016, when he met an old girl friend, Ashley, who invited him to come over later to a house on Rosewood that she shared with an female cousin, Jasmine. RR3-200-205, 235, 237.  Sometime later, he ran into Herron, who he knew from the area where he lived. RR-205-208.  Herron invited himself along when he told him he was planning to walk over to Ashleys. RR3-208-209, 238.[14]

Appellant then stopped at the ARCH and spoke with an "old friend, Paul". RR3-209-210, 238.  When he mentioned his plan to walk to Ashley's, Paul told him "he knew a quicker way" than walking down 7th Street, as he had originally planned, "go to 10th Street, cross the bridge" and go from there. RR3-209, 211.  Appellant said that while he had been to Ashley's before, he was "not familiar with Austin", so decided to follow Paul's advise. RR3-206.

He testified that, during that time, Herron was "a good distance away" talking to someone, and he saw him smoking something but couldn't tell what. RR3-210-211. *See also*, RR3-238-240.

After that, appellant walked up Trinity towards 10th Street, adding that he "actually… tried to sneak off" without Herron, but he caught up with him.

---

[14]/ Appellant did not have a vehicle and took the bus to 6th street. RR3-201, 203-204, 209.

RR3-211-212. At that time, he saw Herron "blowing smoke" that smelled "like fingernail polish", and noticed that, thought usually "very talkative", he was quiet and had "this, like, real, real blank stare" and "this, like, agitated look on his face". RR3-212-213. He said he thought Herron was "on sherm, which is mostly called dip", which is "similar to K2." RR3-213, 239

When they got to 10th Street, they found there was no bridge there, so they "cut[] to 11th Street" and walked east on the bridge over IH 35. RR3-213-214. According to appellant, while on the bridge, a "speeding black car almost hit" Herron, then stopped and "him and" Herron "started arguing and exchanging words." RR3-214-215, 244-248. He said it wasn't long, because when Herron "got out of the way, he pulled off." RR3-215, 243. On cross, he added that he saw only that the driver was "a Caucasian on the phone, but [] didn't see much." RR3-245.

They continued east on 11th until they "come across the parking lot" at the credit union, and Herron "said "Is that that black car that almost hit us?" and he was going to "go check that shit." RR3-216. *See*, *Appendix*, Appeal Exhibit 1.[15] Appellant testified he did not "really know" what Herron meant,

_____

[15]/ That is a 'Google earth' view of the same area like SX-63, from further out, showing the credit union parking lot on 11th Street, east across the bridge over IH 35, abutting the north-bound IH35 frontage road on the west side and the sidewalk and 11th Street on the south,

but "knew it wasn't nothing good", because he could see he was under the influence and thought "[h]e's tripping", "not in his right mind now". RR3-217-218. He continued: "I told him, 'Don't worry about it.' He's making the situation bigger than he's supposed to. 'I got this. You chill right here.'" *Id*. He was "thinking just to go talk to" the person in the car, and "told" Herron "to stay where he was", "by the bank, away from the car." RR3-218-219.

Appellant said then he went up to the passenger side and "knock[ed] on the window", the driver asked "What's up?", and appellant "opened the door." RR3-218. He testified he "said, 'Sir, do you know you almost—' – and [] was trying to tell him that that was us he almost hit, but before" he "could finish the sentence" Herron "opens the [driver's side] door" "and told him to get out of the car, and when he didn't comply… hit him." RR3-218-219.

Herron and Harris then struggled. RR3-219. Appellant said he "was basically telling everybody to chill out, which is slang for 'stop', but they weren't listening". *Id*. He testified he did not go around the car and grab Herron

---

with the credit union building on the east end of the lot. Appellant asks this Court to judicial notice of it. *See*, *Tex.R.Ev.,* Rule 201; Peraza v. State, 457 S.W.3d 134, 142 n.2 (Tex.App.-Hou[1st]2014), *rev'd on other grounds*, 467 S.W.3d 508(Tex.Crim.App.2015); Griego v. State, 345 S.W.3d 742, 747 n.5(Tex.App.-Amarillo2011, no pet.); Granados v. State, 843 S.W.2d 736, 738(Tex.App.-Corpus Christi1992, no pet.).

"[b]ecause I saw the knife in his hand after he hit him in the head. …

Q. [DEFENSE ATTORNEY]: How did you see the knife?

A. Well, when he hit him in the head, I saw his fist balled up and when I looked to the side, I seen that handle. So when he told him – like, after he hit him, the victim, like, he was doing this (indicating) you know, covering up his face. So, I was, like, okay, he hit him in the head. So [Herron] told him to get out of the car one more time, but he started, you know what I'm saying, displaying the knife, you know, swinging it around. So I'm like, 'Coo (phonetic), that's a knife.' So I runs to the other side and I ask him, 'Bro, what are you doing?'"

RR3-219-220.

According to appellant, Harris was "still… holding his face, hurt, I guess. So [Herron] told him, 'I ain't going to tell you another time. Get out of the car.'" RR3-220. Harris got out and "stumbled a little bit, you know, like he was dazed, then" Herron "told him to get on the ground", which he did. *Id*.

Appellant said he asked Herron "what is he doing, and he was like, 'Man, bro' – and then he looked at the victim, then he looked at me, then he said, 'Bro, go check the car." *Id*. Appellant said he did, "because of the knife", he "was scared of [Herron]. It was that knife. As cowardly as it sounds, like, one person was already bleeding. I didn't want to be next." RR3-221. He explained Herron "has a tear drop on his eye", which he understood meant "you murdered somebody and" and "in a gang", and, while he "didn't know if he really killed somebody or was [] trying to look tough", he "didn't want to

become tear drop number two.  So when he said, 'Check the car,' I checked the car." *Id*.

He found two credit cars, and Herron told him "to bring them here." *Id*. Herron then gave him "another card and he told me to go get the money out of the ATM." *Id*.  Appellant said he "told him, 'Why are you trying to make me do it?  It ain't like I can get it off anyway.  I don't have the PIN', and he gave me the PIN." RR3-223.  Appellant testified he was "surprised" and

> "asked him, 'Where'd you get the pin from?'  And he said he got it from the victim, stop asking him questions.
>
> So I said, 'Bro, why you got me doing all this dumb crap?  Like, this man probably ain't even got nothing.
>
> So he'd said, 'Come here,' and he gave me [Harris'] phone and he told me to check the balance."

*Id*.

> According to appellant, he "played like" he tried to use the ATM:
>
> "I knew there wasn't one in the front.  And then he told me to check it in the front.  Like, I went over there, played like, you know what I'm saying, I was attempting to.  But I came back and told him, 'There is no ATM."

RR3-222.  He said he was gone for "[s]ixty seconds, not even enough time to attempt", and denied trying to get any money. *Id*.

Appellant testified Herron then "said, 'Shit,' and then he held his hand

out" and he give him Harris' phone. *Id*. He said he "acted like" he made a phone call, but denied actually making one. RR3-223.

According to appellant Harris or Herron remained where they had been while he walked to and from the building/ATM, and Herron was still standing "[r]ight there by" Harris at that time. RR3-224. He continued that he tried to give Herron the cards, but he told him to "[h]old on to it." *Id*. He told Herron, "'Bro, let's go'", Herron told him "No" and "[g]o check the car again" but he refused. *Id*.

He said Herron then told him "to watch" Harris and "he would go check the car." *Id*. As Herron "was checking the car," he was telling him "'Bro, let's go'", but Herron "starts screaming at" Harris "because now" he " is up trying to flag people… for help", and

"he starts screaming at me, like, 'Bro, what you doing? You're supposed to be watching him. He's going to get us caught.'

And I'm like, 'It ain't on us.'"

RR3-225.

He denied Herron gave him the knife. *Id*.

He testified Herron told him "to crank up the car," but he lied and said "that I didn't know how to crank a car or drive.". RR3-225-227. Herron then

tried but could not start the car, so he eventually got back in and started it, "because he made me. Like, I don't really want nothing to do with this, so I'm trying to do less work as possible." RR3-227-228. That was when he "threw" the cards "back in the car", "I didn't want nothing to do with those cards." RR3-231-232.

Herron then got in the driver's seat and started driving off, but it stalled out, drifted back and hit the pole. RR3-228-229. Appellant said he was arguing with Herron during that: "I'm telling him, like, 'Why you got to take this man's car? This thing probably got a GPS. You're stupid." RR3-228.

Appellant then ran off "on the access road going south." RR3-229. He said he tried but was unable to get away from Herron because Herron was faster. *Id*. He got on a bus, and Herron again followed him onto it. RR3-229-230. Appellant fell asleep, and when he woke Herron was gone. *Id*. He testified he did not go to the police because Herron is "a gang-banger" and he feared for his life, "snitching is not tolerated where I'm from. .. It's the old saying, 'Snitches get stitches and end up in ditches.'" RR3-231.

He denied he ever hit Harris. RR3-232. He also denied that Herron ever said he was going to "catch a lick", "hit a lick", do a crime or a robbery, and said he had no idea what Herron was doing or that he had a knife that night

before he saw it. *Id.*

The State generally sought to impeach appellant, beginning with his actions downtown and the claim Herron was almost hit by a car. RR3-233-242.[16] It elicited that he did "not really" recognize the car when he saw it parked: "it was black. But, [he] wasn't 100 percent sure," though "sure enough" to walk up to talk with him so Herron wouldn't do something. RR3-245-246. He acknowledged Harris did not testify he almost hit someone. RR3-246.

Using the video (SX-54), it questioned him on where he was and the route he took from 11th to Harris' car, trying to show they were behind the car. RR3-250. It then elicited that he is 6'4" and around 260, while Herron is "5-something", at which point he added that Herron had the knife. RR3-251. He insisted Herron had control of the situation. RR3-252. Confronted with Harris' claim that he appeared to be calling the shots, he replied: "most people look at it: You're the big guy, you're in charge." *Id.*

---

[16]/ For example, it expressed skepticism that he was in the downtown/6th Street area for about 5 hours (10 p.m. to around 3 a.m.), past when the bars closed, but insisted he did not drink any alcohol or go into any bars, and his testimony that he only walked around and talked with friends and acquaintances. RR3-233-238. It also elicited that Ashley's house was on Rosewood Street, and sought to show that going to 11th Street was not the faster route (the State appear to be wrong on that: it was a different direction than appellant's original planned route, but he (correctly) explained 11th actually is a shorter route. RR3-240-242.. (Rosewood begins at and runs northeast from 11th, and 11th goes straight to the south end of Rosewood, while 7th goes southeast, away from Rosewood and actually appears to be a longer route. *See*, *Appendix*, Appellant's 2.) It did elicit that, by going to Trinity Street, he went one block in the opposite direction, and that there was no bridge at 10th. RR3-242.

He denied saying "If he moves, cut his fucking throat." *Id*.

He agreed the video did not show him trying to stop Herron, but said "you can't see much on that video. … its from a distance" and the "[t]imeline skips very bad on that." RR3-254. He acknowledged his fingerprints were on the passenger side, and guessed his prints got on the Altoids box "when he told me to check the car." RR3-254-255. He explained he felt like he had to do it:

> "I wouldn't say -- I'll put it like this: I did it to avoid harm. He told me to do it. He's the one with the knife. I thought that I was going to end up like the victim if I didn't comply, you know, like, bleeding and whatnot, so I checked the car. And I guess he didn't like the pace I was going because he was actually telling me to hurry and telling me where to check, 'Check the glove compartment, check the armrest, check the door,' all that right there."

RR3-255.

He agreed that at "one point" Herron told him to guard Harris, and then Herron is not in the picture on the video. *Id*. But, he insisted he did not have the knife. *Id*. Confronted with Harris saying he did at that time, he replied:

> "Yes. But he also said after I came from the ATM he said that I handed the knife to Christian and he said that I told Christian to check the door – to what, start the car. But if you look at the video, Christian's still out there with him."

RR3-256.

He acknowledged a lot of Harris' testimony was accurate, and when the

28

State asked where they should start disbelieving Harris, replied:

> "It's, like, a combination. I mean, what he got against me, I don't know. I actually don't know. But its about what remember or what he recall, you know. Like, he don't recall saying something, or he said something that never actually happened. Like, you got to understand when he got hit, he was dazed, because he stumbled when he got out of the car."

RR3-256-257.

When it noted he was now testifying but said he didn't say anything before because he didn't want to be a "snitch", he replied that was because he was facing very serious criminal charges and

> "didn't really know about the laws of parties. And I didn't know that I can get the same exact thing he got even though I didn't do it…
>
> .. like, if it looks – not necessarily is, if it looks like you tried to aid in any way, you get the same thing as the person that put their marks on him, as the person with – you know, the weapon, who originated the idea, who directly carried it out."

RR3-258. He acknowledged Harris had "nothing to gain" from testifying, "[b]ut just because that's what he thinks happened doesn't mean it happened."

RR3-261.

Both sides then rested and closed. RR3-262.

### 3. The jury charge as a relevant whole.

The guilt/innocence jury charge as a relevant whole read as follows:

"You are instructed that the law applicable to this case is as follows:

1.

A person commits the offense of Aggravated Robbery, if he commits the offense of robbery as hereinafter defined, and he uses or exhibits a deadly weapon.

2.

A person commits the offense of Robbery if in the course of committing theft as hereinafter defined and with intent to obtain or maintain control of the property he:

1. intentionally, knowingly, or recklessly causes bodily injury to another; or
2. intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.

3.

A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property.

4.

…
"In the course of committing theft" means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft.
….
"Bodily injury" means physical pain, illness, or any impairment of physical condition.

"Deadly weapon" means anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

5.

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is

aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or that the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the defendant's standpoint.

6.

All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

In a prosecution in which an actor's criminal responsibility is based on the conduct of another, the actor may be convicted on proof of commission of the offense and that he was a party to its commission, and it is no defense that the person for whose conduct the actor is criminally responsible has been acquitted, has not been prosecuted or convicted, has been convicted of a different offense or of a different type or class of offense, or is immune from prosecution.

7.

Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that the defendant, RODERICK PAYTON, on or about the 25th day of March, 2016, in the County of

Travis and State of Texas, did then and there, while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally, knowingly, or recklessly cause bodily injury to Robin Harris by striking Robin Harris with his fist or hand, and the said RODERICK PAYTON did then and there use or exhibit a deadly weapon, to wit: a knife, then you will find the defendant guilty of Aggravated Robbery and so say by your verdict. But, if you do not so believe, or if you have a reasonable doubt thereof, you will acquit the defendant of the offense of Aggravated Robbery and so say by your verdict not guilty."

CR-89-91.

### 4. The charge erroneously failed to include any reference to guilt as a party in the application paragraph.

The application paragraph contains **no** reference at all to commission "as a party". That is error because law of parties is included in the abstract part, and the case was in fact tried under a parties theory. *See*, RR4-8-37(closing arguments). *See*, Vasquez, 389 S.W.3d at 367-369; Ferreira v. State, 514 S.W. 3d 297, 302(Tex.App.-Hou[14th]2016, no pet.). It also was error because appellant could not be convicted as a principal under this indictment. *See*, Plata v. State, 926 S.W.2d 300, 303-304 (Tex. Crim.App.1996), *overruled on other grounds*, Yzaguirre v. State, 394 S.W.3d 526(Tex.Crim.App.2013).[17] It is un-

---

[17]/ Yzaguiree holds Plata's holding that such error requires reversal whenever evidence for guilt as a principal is insufficient is no long valid in light of using a 'hypothetically correct' jury charge to measure sufficiency, as required by Malik v. State, 953 S.W.2d 234, 234(Tex. Crim.App.1991), if there is sufficient evidence as a party and some instruction on parties was given, even if only in the abstract portion of the charge. But, it did not disavow the holding that it is jury charge error.

disputed the only "bodily injury" to Harris was "cause[d]" by Herron hitting

him in the temple. Indeed, the State corrected appellant when he said Harris

had testified both hit him: "What he said was that Rico [Herron] hit him with

his hand." RR3-253. There is no evidence appellant touched, let alone caused

him any injury. Thus, once "the acts and conduct of" Herron are "remove[d]

from consideration", the evidence "shows, or raises an issue, that the conduct

of" appellant "is not sufficient, in and of itself, to sustain" this conviction, so

> "the State's case rests upon the law of principals [parties] and is
> dependent, at least in part, upon the conduct of another. In such a case,
> the law of principals [parties] must be submitted and made applicable to
> the facts of the case."

Brown v. State, 716 S.W.2d 939, 944(Tex.Crim.App.1986). Brown specific-

ally noted this charge is required "where the issue is raised or there is a ques-

tion or dispute as to whose activity cause the specific result, such as … whose

blow or kick hit the victim…" *Id*. at 945(quoting McClung, "Jury Charges for

Texas Criminal Practice" (rev.Ed.1985)).

Evidence appellant may have threatened Harris with bodily injury, if

he did, would not authorize the jury to convict him **as a principle** here. Para-

graph 2 does define robbery in the abstract as either "causes bodily injury to"

or "threatens or places another in fear of imminent bodily injury…" But there

is no reference to the second in the indictment, application paragraph or the

remainder of the charge. An abstract charge on a theory of law that is not applied to the facts does not lawfully authorize the jury to convict upon that theory. *See*, <u>Crenshaw v. State</u>, 378 S.W.3d 460, 466(Tex. Crim.App.2012). Whether considered different offenses or alternative means, proof of "threatens or places in fear" will not authorize a conviction for "causes bodily injury". *See*, <u>Cooper v. State</u>, 430 S.W.3d 426, 427-435 & 440-444(Tex.Crim.App. 2014)(opinion of court, Keller, P.J., joined by Johnson, J., concurring, and Price, J., joined by Keasler and Hervey, JJ., dissenting); *cf.*, <u>Landrian v. State</u>, 268 S.W.2d 532, 540(Tex.Crim.App.2008) and cases cited threat.

**5. The charge erroneously failed to apply the law of parties to the facts.**

**6. The charge erroneously authorized conviction without any finding beyond a reasonable doubt on the essential element that appellant possessed the required specific intent of "caus-[ing] bodily injury to Robin Harris".**

**7. The charge erroneously authorized conviction without a *unanimous* finding beyond a reasonable doubt on that essential element.**

The charge was erroneous for failing to apply the law of parties to the offense as indicted and the facts. When the law of parties is part of the law of the case in jury charge, the

> "… charge is adequate for this purpose only if either contains an application paragraph specifying all of the conditions to be met before a conviction under such theory is authorized, or contains an application paragraph authorizing a conviction under the conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers, or contains some logically consistent combination of such paragraphs."

Plata, 926 S.W.2d at 304. *See also*, Vasquez, 389 S.W.3d at 367. Vasquez states that it is not error to fail to include language narrowing party liability to the specific facts of the case when there is "a general reference to the law of parties **in the application paragraph**" and no objection or request. *Id*., at 368; Ferreira, 514 S.W.3d at 303. There was no reference at all to parties in this application paragraph.

In addition, it erroneously authorized conviction under this indictment if appellant lacked the specific intent to cause Harris bodily injury. The *Texas Penal Code* relevantly defines "aggravated robbery" as commission of robbery and use or exhibition of a deadly weapon. *Texas Penal Code, Sec*. 29.03(a)(2). It relevantly defines 'robbery' as

> "in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control over the property, he: 1. intentionally, knowingly, or recklessly causes bodily injury to another; ..."

*Id*., Sec. 29.02(a). The gravamen of robbery is the assault, not theft or attempted theft. *See*, Ex parte Hawkins, 6 S.W.3d 554, 560(Tex.Crim.App.1999);

35

Green v. State, 840 S.W.2d 394, 401(Tex.Crim.App.1992); Matlock v. State,

20 S.W.3d 57, 63 (Tex.App.-Texarkana2002, pet. ref'd); Purser v. State, 902

S.W.2d 641, 647(Tex.App.-El Paso1995, pet. ref'd).[18]

The indictment alleged only sec. 29.02(a)(1), i.e., "causes bodily injury

to" Robin Harris. Thus, the robbery offense in this case was a result-, not

conduct-, offense, i.e., conviction required proof appellant specifically intended

to cause bodily injury as alleged:

> "'What matters is that the conduct (whatever it may be) is done with the required culpability to effect the *result* the Legislature has specified."

Landrian, 268 S.W.2d 532, at 540(quoting Alvarado v. State, 704 S.W.2d 36,

39(Tex.Crim.App.1985))(emphasis in original). *See and cf.*, Price v. State, 457

S.W.3d 437, 442(Tex.Crim.App.2015); Brown v. State, 595 S.W.2d 550, 551-

552(Tex.Crim.App.1980).

Further, the abstract (and only) party charge actually given invoked only

Sec. 7.02(a)(1). That also "clearly means, at a minimum, that a defendant must

act intentionally with respect to the result elements of a result oriented

---

[18]/ Thus, actual commission of theft is not a prerequisite of robbery. *See*, King v. State, 157 S.W.3d 873, 874(Tex.App.-Houston[14th]2005, pet. ref'd); Garza v. State, 937 S.W.2d 569, 570 (Tex.App.-San Antonio 1996, pet. ref'd); Yarbrough v. State, 656 S.W.2d 200, 201(Tex. App.-Austin 1985, no pet.). Proof of a completed theft is not required, robbery includes those instances in which bodily injury is inflicted in an attempt to commit theft. *See*, Bustamante v. State, 106 S.W.3d 738, 740(Tex.Crim.App.2003); Wolfe v. State, 917 S.W.2d 270, 275(Tex.Crim.App.1996).

offense." <u>Nava v. State</u>, 415 S.W.3d 289, 298-299(Tex.Crim.App.2013). In other words, the proof must show he aided "the entire offense, that is, both the theft and assaultive component of the aggravated robbery". <u>Wooden</u>, 101 S.W. 3d at 547. There was no charge under Sec. 7.02(b), i.e. party by conspiracy. As a result, the jury could not lawfully convict by finding instead that he conspired with Herron, and Herron's causing bodily injury was "in furtherance of the unlawful purpose and… should have been anticipated as a result of the carrying out of the conspiracy." <u>Wooden</u>, 101 S.W.3d at 547. *Compare*, <u>Cienfuegos v. State</u>, 113 S.W.3d 481, 492-494(Tex. App.-Hou[1st]2003, pet ref'd). A proper charge would have required proof beyond a reasonable doubt of "an intent to promote or assist, not only the commission of the underlying" theft "but also the result" of Herron causing bodily injury to Harris. *See*, <u>Nava</u>, 415 S.W.3d at 299-300.

But, this charge nowhere informs the jury that in order to convict it must first find appellant had the specific intent to cause the result of bodily injury to Harris. Instead, paragraph 5 defines the *mens rea* in the disjunctive as conduct-oriented or result-oriented:

> "… when it is his conscious objective or desire to engage in the conduct or cause the result.

… when he is aware of the nature of his conduct or that the circumstances exist… [or] when he is aware that his conduct is reasonably certain to cause the result.

… when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or that the result will occur. …"

Doing so was also error, because the offense actually tried was a result offense:

"A trial court errs when it fails to limit the language in regard to the applicable culpable mental states to the appropriate conduct element. …

If the gravamen of an offense is the result of conduct, the jury charge on culpable mental state should be tailored to the result of conduct … If the offense has multiple gravamania, and one gravamen is the result of conduct and the other is the nature of conduct, the jury charge on culpable mental states must be tailored to both the result of conduct and the nature of conduct,"

Price, 457 S.W.3d at 441(discussing cases).

This error was compounded by the others, so that taken as a whole this charge authorized conviction without finding appellant **himself** specifically intended bodily injury be caused to Harris, **or even if he in fact did not intend it.** Instead, reading it authorized conviction if the jury found only that

1) Herron intended to commit theft and caused bodily injury to Harris by striking him with his fist or hand,

2) appellant's conduct aided or assisted Herron in some way,

3) appellant had a "conscious objective or desire to engage in" the "conduct" that aided or assisted Herron, **but did not** intend that Herron cause the result of bodily injury to Harris, and

4) one of them "exhibited" (but did not "use") a deadly weapon at some point.

It also authorized conviction if they found: 3) appellant intended to commit **theft**, **but not** cause bodily injury to Harris. Further, given para. 2 reciting in the abstract the law of Sec. 29.02(a)(2), it might even be read to authorize conviction if: 3) appellant in fact only intended to "threaten or place" Harris in fear "of imminent bodily injury", if he did, but **not** to cause him bodily injury.

Authorizing conviction without requiring a finding that he possessed specific intent to cause bodily injury to Harris was error. *See and compare*, Nava, 415 S.W.3d at 298-301*; cf.*, Gross v. State, 380 S.W.2d 181, 186-189 (Tex.Crim.App.2012); Brown, 595 S.W.2d at 551-552; Cienfuegos, 113 S.W. 3d at 493. Indeed, the charge authorized conviction even if the jury found the bodily injury was the result of Herron's **independent impulse**, which in fact would require acquittal. *See*, Binyon v. State, 545 S.W.2d 448, 451 n.2(Tex. Crim.App.1976); *cf.*, Solomon v. State, 49 S.W.3d 356, 368(Tex.Crim.App. 2001).[19]

Finally, by doing so, it also authorized a non-unanimous verdict: i.e., where some jurors found he had the specific intent, while others found he did

---

[19]/ Solomon reaffirmed that conviction could not be had under that circumstance, but held defendant was not entitled to a separate jury charge on independent impulse.

not but convicted under one of the other readings of the charge that did not require that. Whether treated as alternate offenses or manner and means, "cause bodily injury" and "threat or place in fear" are essential elements. *See*, Cooper, 430 S.W.3d at 427-435 & 440-444. Juror unanimity is required on elemental issues. *See*, Pizzo v. State, 235 S.W.3d 711, 718-719(Tex.Crim.App. 2007). A charge that allows conviction without unanimous finding on all elements is error. *See and cf.*, Landrian, 268 S.W.3d at 540; Stuhler v. State, 218 S.W.3d 706, 717-719(Tex.Crim.App.2007); Jefferson v. State, 189 S.W.3d 305, 312-313(Tex.Crim.App.2006).

### B. Egregious Harm.

#### 1. The jury notes.

The jury sent two notes out during deliberation. They provide important evidence on egregious harm because, in short, they seem direct evidence the errors actually affected deliberations and probably, at least, adversely impacted their verdict in a way the cases holding them error sought to prevent, and which would deny a "fair and impartial trial", "go to the very basis of the case", "deprive the defendant of a valuable right", or "vitally affect [a] defensive theory". *See*, Castillo-Fuentes v. State, 707 S.W.2d 559, 563 n.2(Tex.Crim.App.1986) (jury note is direct evidence).

The first stated:

"Question:
Does 'effective consent' apply to the law of parties?

So, does it matter whether or not we think Mr. Payton is being coerced for the law of parties to apply?"

CR-76-77; RR4-37-38.

The second read:

"Does the charge in section 7 where it states "by striking Robin Harris with his fist or hand' mean that Roderick Payton, himself, did the striking? Did he do the hitting?

Or does this imply by law of parties, he hit Robin Harris?"

CR-78-79; RR4-38-39.

The first seems direct evidence that they actually adversely affected his defensive theory that he did not intend to commit the aggravated robbery and acted out of fear of Herron ("coerced"), at least. There would be no reason to ask the second part unless some juror(s) had a reasonable doubt on that.

The second shows the jury was confused about what the law required on "causing bodily injury" and focused on the wrong issue: i.e., whether he himself had to hit Harris or was "implied" to if they found him to be a party, rather than having to unanimously determine whether he specifically **intended** to cause bodily injury to Harris, whoever hit him, **in order to find he was a**

**party**.  As stated in <u>Castillo-Fuentes</u> of an similar situation, albeit a different charge error: the jury's questions "strikingly shows… in a non-theoretical, real-life situation" the problems cases holdings these are charge errors sought to prevent: "it shows the jury was confused and mislead" to reject find guilt without unanimously finding he acted with the required specific intent. 707 S.W.2d at 563. *See also*, <u>Ruiz v. State</u>, 753 S.W.2d 681, 687(Tex. Crim.App.1988).

In both instances, the court responded by merely directing jurors back to the original, erroneous charge.  As was said of a similar response in <u>Castillo-Fuentes</u>:

> "The court in directing the jury [back to the charge] as a response to their confusion merely compounds the original error… The court did not resolve this issue by redirecting the jury to consider the charge as originally misstated."

707 S.W.2d at 563.

### 2. The entire jury charge.

Taken as whole, the jury charge does not lessen the problems here but instead aggravates them. *See*, (A)(5 - 7), *supra*.

### 3. The state of the evidence, including contested issues.

The critical contested issue in this trial were whether the State proved beyond a reasonable doubt that appellant acted with the required intent, i.e.,

intending to commit the aggravated robbery as alleged in **this** indictment and set forth in **this** application paragraph, including specific intent to cause bodily injury to Harris. If the jury had a reasonable doubt whether he acted because he was coerced by or out of fear of Herron, or otherwise lacked the required intent, it should have been obligated to acquit.

It is undisputed appellant did not strike Harris or otherwise cause him bodily injury. There is no evidence that he knew Herron would do that, or that he told or wanted him to before Herron did so. Indeed, as both Harris and Gutierrez said, the offense seems to have been spur of the moment, not planned, as opposed to the inferences the State argued. The only evidence contradicting appellant's testimony that he only went to the passenger door to talk is Harris' saying he "reached in… and tried to start releasing my seatbelt". But he did not mention that until redirect, after the defense already pressed him on the lack of obvious culpable acts to that point by appellant. It apparently was not in any of his prior statements. Appellant denied doing it. It appears to be a classic witness "swearing match".

That seems to also be the case with the rest of the evidence the State argued disproved his defensive theory, such as Harris' testimony that appellant told Herron or threatened to "cut his throat" if he moved - was denied by

appellant classic "swearing match". The video appears to conflict with critical portions of Harris testimony about appellant's actions, e.g., the 45 seconds in which he said he walked from the ATM, exchanged the knife with Herron, then Herron got into and tried to but could not start the car, so he returned to appellant, took the knife back and stood over Harris again while appellant got back into to and started the car; and Harris' claim he was gone to the ATM for 3 minutes instead of the less than 1 minute appellant said he "played" at going to ATM simply to satisfy Herron's demand. The jury notes seem to indicate at least some jurors did not find the evidence "overwhelming" for the State.

### 4. Voir dire and arguments of counsel.

### a. The voir dire of the venirepanel.

The State's voir dire is some 90 pages. RR2-32-122. Noteable here are the parts covering the law of aggravated robbery, deadly weapons and parties. In short, the State spent considerable time discussing how robbery could be by "threatening bodily injury", a weapon could be deadly merely by use in a threat, and party liability, with only a single passing reference to "caused bodily injury to the victim," (and only as to not **serious** bodily injury).

It began saying it was "the law that we expect is going to apply to this case." RR2-35. Discussion of aggravated robbery begins at RR2-44, and

repeatedly defines it as (or agrees with veniremembers who say it is), theft **plus either** bodily injury **or threatening** same.  RR2-46-51. *See also*, RR2-52.[20]

A page later it turned to that "aggravated robbery with a deadly weapon". RR2-53-63.  Of note there is emphasis on the fact a deadly weapon could be anything and the important fact is not how it is used but "intended" use, and a veniremembers summing it up as "[i]f it's used to **threaten or coerce**, then it becomes a deadly weapon", to which the State replies, "Good." RR2-63.  It then agreed with another veniremember that it could be "even if he didn't pull it out of his pocket, if he knew – had the intention…" *Id*.

A page later the State stated it had "to prove" appellant *inter alia* "caused bodily injury to the victim," Harris, "by striking him with his fist and his hand, and he used or exhibited a deadly weapon, a knife." RR2-64.  But, it then explained it is "not **serious** bodily injury, and doing it with a deadly weapon, okay?  You all with me?  Good." RR2-65.  Absent is any disavowal of "threat-

---

[20]/ Thus, it twice states "robbery equals theft plus this idea of bodily injury **or** the **threat** of bodily injury or death." RR2-46.  It then elicits agreement from a veniremember that "even a **threat** during the course of taking" of property is robbery. RR2-47.  It then says "[s]o if I **threaten** her even after I've gotten away with the property itself.  That's a good one." RR2-48.  When a veniremember states robbery was theft "and you either committed bodily injury with this person **or said** that you were going to…", the State replied "Right." *Id*.  It then repeated its example: a person "say[s], 'Give me you glasses', and I've **threatened** her **or** I hurt her somehow…", eliciting veniremembers agreement that that was a robbery. RR2-49.  A few moments later it again repeated "robbery" is theft plus bodily injury --… **or** the **threat** of imminent bodily injury", and becomes "aggravated robbery" with e.g. "use or exhibit a deadly weapon". RR2-51.

en" or statement that appellant himself must intend the bodily injury.

It then immediately turned to the law of parties:

"MR. HENSCHKE [No. 55]: Is that basically saying, like, if the other person has the knife, like, he's still **guilty by association**?

[PROSECUTOR]: I think what it's saying is –

MR. JENSCHKE (sic): That's acting as a party?

[PROSECUTOR]: **Yeah**. What – well, how does that look to you?

MR. JENSCHKE: You're part of the offense.

[PROSECUTOR]: **Right**. So you're saying that someone is –

MR. JENSCHKE: Because you're committed to the **conduct** of the other person, you're in on it.

[PROSECUTOR]: **Yeah**."

RR2-65-66.

A few moments later, it explains that being a party is "not just that you are there", "you have to solicit, encourage, direct, aid or attempt to aid, right?" RR2-67. After some discussion of various examples, e.g., the 'getaway driver', the State addresses intent thus: "So it is with an intent to commit a crime that we're talking about. … Its the intent to do what is agreed upon to be done." RR2-70. After discussing other examples - none of which is like this case - a veniremember asked what "if somebody's being blackmailed to do something".

46

RR2-76.  The State replied "You must intend to cause that result, 'I have an intent to make this thing happen,'" but then explained "But we're just – **we're talking about just the behavior itself** right now." RR2-76.  It then discussed how one could be a party for acts committed only "after the fact, right?  It doesn't have to be during, necessarily." *Id*.

The State then turned to other unrelated topics. RR2-77-122.  The only thing noteable there are two brief anodyne statements on jury unanimity: "but its is a unanimous decision.  So at the end of the case, it's the 12 together as one expressing guilty or not guilty, right?", RR2-84; "Everything has to be unanimous", RR2-107.

The defense voir dire covered issues of e.g, possible problems with witness perception and memory, reasonable doubt, the reality of the dangers of 'snitching', and punishment philosophy. RR2-130-167.

### b. Opening arguments.

The State's opening characterized them as "Payton and his accomplice", and at one point claimed appellant "was the one kind of directing the whole operation". RR3-11.  It mostly did not differentiate between him and Herron, instead treating them rhetorically as a whole: i.e. they "approached the vehicle from behind and accosted [] Harris", "they punched him in the head", causing

the laceration, "and he was held at knife point while they went through his car, took his wallet," and phone, and eventually unsuccessfully tried to drive off in his car before walking away. RR3-10-11. However, it did assert that "at some point in time" appellant "had the knife in his hand as well, guarding [] Harris while the other defendant was going through the car". RR3-11.

Defendant's opening began by asserting he "never hit" Harris, "never pulled the knife on" him, "didn't have the knife and didn't know what was going on". RR3-13-14. It conceded there had been a robbery but, noting "the law of parties", argued the issue the jury would "have to decide" was appellant's "intent." RR3-14, 19, 21. It claimed it "wasn't a planned robbery", and Herron "is the one who committed this robbery". RR3-14-15. It set forth the defensive theory it ultimately argued and asserted facts in support it expected to be shown. RR3-18- 21.

### c. Closing arguments.

The State's first close does not address specifically whether appellant intended to case bodily injury to Harris. Rather, it seems to be he was guilty because he participated in the theft and threatened or placed Harris in fear, so he was "involved, if not the ringleader". Whether deliberate or not, it seems to exploit rather than correct the errors in the charge.

48

It began by "highlight[ing]… important parts" of the charge, noteably that the definition of "robbery" includes "… intentionally, knowingly, or recklessly causes bodily injury, **intentionally places someone in fear**." RR4-8.

> "You have the theft. There's been no dispute about that. You have bodily injury. … And there's a deadly weapon, the knife. Nobody's disputing that.
>
> So all the elements are there for an aggravated robbery. So now we need to switch to, "How do we know that the Defendant participated in that aggravated robbery?' Why is he just as guilty as his Codefendant – as the other person charged?…"

RR3-9.

It then argued he participated in the theft, and "we're talking about the law of parties here, so it doesn't really matter that he did not hit [] Harris" because he "helped". RR4-9-11.[21] It said he "tried to take" Harris' "seatbelt off to help [Herron] get him out of the car", and "guarded him while" Herron "was in the car. RR4-11-12. It argued Harris' testimony he threatened him was enough by itself:

> "He held the knife at the victim… That right there is proof in and of itself that he committed, much less helping [Herron]. But the two big

---

[21]/ He "didn't stand there passively hiding his head saying, 'Oh what am I part of this?", he "rifled through the glove box, took the cards and went to the ATM (disputing "he was just faking it"), appellant looked through Harris' cell phone and got the passcode, "[h]e tried to take the car" and "kept the keys". RR3-9-11.

ones—and I want you to remember this, 'If he moves, cut his fucking throat.' That what [] Harris said [appellant] said to [Herron].

.. He was participating at the bare minimum, probably more likely was the one in charge. …

… [] Harris said he told him, 'If you give me the wrong code, I'll kill you.' Not a scared patsy, an active participant, the ringleader."

RR4-12-13.

It then asserted all the elements were proved *inter alia* "[w]e know there was a theft", and "Harris was injured… hit with a fist holding that knife." RR4-13. It claimed "[t]he only thing that's being challenged here today is intentionally, knowingly, or recklessly." *Id.* To answer that it argued that he "was, at least, involved, if not the ringleader…. Either way, he's guilty." RR4-14.

The defense close began by discussing reasons for reasonable doubt on important parts of Harris' testimony (e.g. that appellant seemed to in "in charge", tried to open his seatbelt at one point, ever had the knife), and corroboration of important parts of appellant's. RR4-14-22.[22] It argued "Herron did

_____

[22]/ Thus, he argued the 45 seconds the video proved was insufficient for appellant to do the things Harris said he did after going to the 'ATM', and specifically rebutted the claim that he was given the knife by Herron and stood guard on Harris; that Harris' testimony he was at the ATM 3 minutes was disproved by the video showing it was about 1 minute,; and his testimony he was parked for 15 minutes before appellant and Herron is disproved by the video showing only 6 or 7 minutes. RR4-17-18. It argued parts of Harris testimony, the video, and the fingerprint evidence corroborated appellant on e.g. the time between the car almost hitting Herron and their being in the parking lot (thus supporting that), that he faked using the ATM, left the bank cards in the car rather than wanting to use them, and the lack of fingerprints on the seatbelt buckle. RR4-18-23.

it all", appellant was not "part of this robbery" and never hit Harris, RR4-18, 22, and

> "… There's obviously doubt, because he's telling you a different story. The question is: Is it reasonable? Is it a reasonable doubt? Is it a reasonable doubt that he didn't have anything to do with it?
>
> Gone through his – what he's done, things that you know, uncontroverted evidence. His mere presence alone is not sufficient. Did he – was he actively participating? He never punched him. He never had the knife. And he never used those credit card and those ATMs [sic], and he actually dropped them and left them on the floor there."

RR4-23-24.

Like its first close, the State's surrebuttal does not appear to address the issue of specific intent to injure Harris. Instead, it argued that all of Harris's testimony should be believed while calling appellant's "a fabrication". RR4-24-32. It then argued that under the law of parties:

> "… when you're in for a penny, you're in for a pound. And what that means is once you cast your lot with somebody, once you say, 'This is something that were going to do together' … you're in. All in. And you don't get to decide how responsible you are. You're responsible for everything that happens from then on."

RR4-33. It said appellant was "actively involved in this robbery", "rifles through the glove box", "look[]s through the phone and get[s] that bank information", "walks up to the ATM to see if that's something he can get away with. And after even all of that, he tried to get away in the vehicle." *Id*.

"If you believe [Harris'] testimony then you believe that [appellant] was in control of this situation, that [he] at one point held that knife as well and threatened to cut his throat, and told Herron to cut his throat if he moves.  If you believe [] Harris, then you believe [appellant] is guilty of aggravated robbery.

If you believe any of this, you know that, regardless of the fact that it was Herron who made this happen, who caused this wound to occur on [] Harris, you know that [appellant] is also responsible.  In for a penny, in for a pound.  You don't get to decide how responsible you are once you cast your lot with somebody."

RR4-34.

This appears to be an argument for convicting appellant based on participating **without regard to** whether jurors unanimously believed he possessed specific intent to cause bodily injury to Harris or not.  But, that is not sufficient for conviction on this indictment and charge.[23]  Whether deliberate or not, it too seems to exploit rather than correct the errors in the charge.

## PRAYER FOR RELIEF

For the reasons stated, appellant asks the conviction and sentence be set aside and the case remanded for retrial consistent with the judgment and opinion of the Court, and such other relief to which he is entitled.

RESPECTFULLY SUBMITTED,

---

[23]/  In addition, there was no evidence of an agreement between appellant and Herron before he hit Harris and, as at least two witnesses testified, this did not seem to be a planned offense. This is a case under *Tex.PenalCode*, Sec. 7.02(**b**) (conspiracy), not under 7.02(a)(1), conspiracy was not alleged in the indictment or included in the charge.

/s/ Christopher P. Morgan
Christopher P. Morgan
State Bar No. 14435325
3009 N. IH 35
Austin, Texas 78722
(512) 472-9717 // FAX:  472-9798
ATTORNEY FOR APPELLANT

**CERTIFICATE OF SERVICE:** I, Christopher P. Morgan, hereby certify a true copy of this Brief has been served on the Office of the District Attorney for Travis County, Texas on December 15, 2017, by hand.

/s/ Christopher P. Morgan
Christopher P. Morgan

**CERTIFICATE OF WORD COUNT:** I, Christopher P. Morgan, hereby certify the word count is 12,891, excluding matters in *Tex.R.App.Proc.*, Rule 9.4(I)(1)).

/s/ Christopher P. Morgan
Christopher P. Morgan

E 11th St & N Interstate 35 Frontage Rd - Google Maps



E 11th St & N Interstate 35 Frontage Rd

Google Maps

https://www.google.com/maps/place/E+11th+St+%26+N+Interstate+35+Frontage+Rd,+Austin,+TX+78702/@30.2709756,-97....    12/5/2017

Imagery ©2017 Google, Map data ©2017 Google    100 ft

Rosewood Ave - Google Maps



Rosewood Ave

Map data ©2017 Google    500 ft

https://www.google.com/maps/place/Rosewood+Ave,+Austin,+TX+78702/@30.2665927,-97.7290631,16.1z/data=!4m5!3m4!1...    12/6/2017